## Commonwealth ex rel. McDonald *v.* McDonald, Appellant.

Argued October 5, 1956. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (HIRT, J., absent).

*Paul W. Knox,* with him *Rambo, Knox & Landreth,* for appellant.

*Paul Ribner,* for appellee.

OPINION BY WOODSIDE, J., June 11, 1957:

This is an appeal from an order of the Municipal Court of Philadelphia granting custody of a minor child to his father, Francis R. McDonald, who had instigated this habeas corpus proceeding against Mary McDonald, paternal aunt of the father.

The child, Raymond Gerald McDonald, was born July 26, 1944. He was the product of a war marriage, which, during the few years of its existence, was marred by numerous separations.

The mother obtained a divorce from the father in Mississippi in March of 1948. The father claimed that he received no notice of this divorce action, and that he had no knowledge of it until long after the decree

was entered. The Mississippi divorce decree placed Raymond Gerald "in the full and complete care, control and custody" of his mother. At that time she did not have actual custody of the boy, and she has shown no particular interest in him since 1947 when she left him with her mother in Plant City, Florida.

While Raymond was with his maternal grandmother in Florida, the father, according to his own testimony, "walked into the house and picked the boy up and took him" to the home of the child's paternal grandfather in North Carolina.

During the month of December 1947, when Raymond was three years old, the paternal grandfather brought him to Mary McDonald with whom he has lived since that time. Miss McDonald is a teacher in the Philadelphia public school system. At the time of the hearing she was 49 years old, and resided at 2517 N. Howard St., Philadelphia, with her younger sister, an accountant, and an older, retired, brother.

The father came to live at the McDonald home in 1948. After a few months in the Merchant Marine he decided, at his aunt's suggestion, to continue his studies in order to obtain a high school diploma. Thereafter, he went to the Philadelphia Textile Institute, receiving benefits under the so-called G.I. Bill of Rights. After graduating from the Philadelphia Textile Institute in June of 1954, the father went to Buffalo where he is now employed by the Buffalo Electrical Chemical Company as a chemist. In March of 1955 he married his present wife, a Philadelphia girl. On July 27, 1955, he brought this action to recover custody of his child.

Raymond has had a good home with Mary McDonald. She has supported him since he was 3 years old. She spent substantial sums in looking after his health, having his tonsils removed, keeping him in a hospital for a month, and giving him other costly medical treat-

ment. She helped him with his lessons, encouraged him with his hobbies, and saw that he was associated with character building organizations. He has his own room in her house.

She has been rearing him in a religious atmosphere. She regularly attended the Evangelical Church, and sees that the boy gets proper religious training. The trial judge said to her counsel during the hearing: "This court is completely satisfied that your clients and your witnesses are very much attached to this boy and they have done everything they could in the light that they saw it, for the boy's interest and welfare."

The father did not accept any financial responsibility for his son. He received $30 per month from the Veterans Administration for the support of his child but spent it on himself, never telling his aunt about this award, and allowing her to pay all his son's expenses. Although he said he gave some money towards the support of the child, when pressed for the number of times he made contributions he replied: "It was—I'll admit it wasn't too many times at all." He and his wife are now earning $650 a month, but the father has not even paid the aunt money which he borrowed from her, let alone acknowledging any financial liability to her for the support of his son. The father and his wife have only one bedroom in their apartment. The father belongs to no church. The child is emphatic about his desire to stay with his aunt, whom he calls "Momie". He insists that he will not go to live with his father.

Although the court stated, "My sentiments were not then entirely with the father and they are not with him entirely now", he nevertheless, awarded the boy to the father, feeling that the boy needed male companionship, and that the parent had the prior right to his child.

Recognizing that the trial judge had an opportunity to evaluate the fitness of the parties to have custody

of the child through observation of them, which an appellate court lacks, and that prima facie the parent is entitled to the custody of a child, we, nevertheless, are of the opinion that the child should not be compelled to live with father and step-mother.

The paramount consideration is the welfare of the child, and to this all other considerations, including the rights of parents, are subordinate. See *McNamee v. Jackson,* filed this day.

The child's physical, intellectual, moral, spiritual and emotional well being must be the paramount considerations.

Religious training is a matter of serious consideration in the life of any child. Raymond has been living in a religious atmosphere. The father is not a member of any church. In his testimony he indicated that he does not even know what is meant by church membership. The step-mother is a Jewess, who apparently is not active in the religion of her own, or any other, faith. It is evident that this child's religious training would come to a complete halt were his custody given to his father and step-mother.

Furthermore, the father has not given the financial assistance toward the support of his son, that an interested father should have given. The father's education was obtained, at least in part, by the use of money given by the government for the support of his son. Although sons generally receive their education at the expense of their fathers, we have here a father who received his education at the expense of his son.

The boy is doing well in school, being in the upper half of his class, and is receiving regular assistance in his studies from his aunt, who is professionally trained to assist him, and who has demonstrated her interest in doing so. The father's one attempt to assist the boy in his lessons apparently ended in failure.

Whether the father beat him and left him crying, as the defendant and her witnesses testified, or whether this characterization of the incident is "ridiculous", as the father testified, is relatively unimportant. Based on past experience it is evident that the child's education would receive more intelligent and sympathetic treatment at the hands of the aunt than at the hands of the father.

We would be gambling with this boy's future were we to compel him to go, against his will, with his father into a strange community, a strange school, and a strange home lacking in religious background.

Although the expressed wish of a child is not controlling it constitutes a factor which should be carefully considered. When a child of the age of the boy here involved is emphatic in his preferences, we must seriously consider the emotional effect upon him were he compelled to follow a course which he detests and fears. No desires are as strong nor fears as great as the desires and fears of youth. A twelve year old boy is an individual, and reacts as one. His lack of control over his own destiny can be frustrating to the degree that it becomes emotionally disturbing and permanently harmful. Making due allowance for the immaturity of his judgment, and the fact that a child his age frequently does make a quick adjustment to a new environment, we, nevertheless, feel we would be gambling with his future to compel him to live with his father and step-mother.

We, therefore, are of the opinion that the petition for a writ of habeas corpus should be dismissed. We assume that the aunt will recognize her legal duty to permit the boy's father rights of visitation within this Commonwealth.

The order of the court below placing custody in the father was entered in May of last year, but was not to become effective until the end of the school term in

June. In the meantime, Raymond disappeared. The appellant claims that he left her home when she was not there, and that she does not know where he is. The court below did not believe her, declared her in contempt of court for failure to obey the court's order to produce the child and sentenced her to imprisonment until the contempt is purged. She appealed this sentence, and was released on bail.

In the light of our conclusion on the petition for the writ of habeas corpus, and the lack of direct positive testimony concerning her knowledge of the child's whereabouts, we think the contempt proceeding should also be dismissed.

Orders reversed and the petitions for a writ of habeas corpus and to declare the appellant in contempt of court are both dismissed.