Commonwealth ex rel. Newel *v.* Mason.

Argued November 19, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

Before MOOK, P. J.

*Kenneth W. Rice,* with him *Max B. Maloney,* for grandparents, appellants.

*J. H. Bozic,* with him *Bozic & Bozic,* for mother, intervening appellant.

*Stuart A. Culbertson,* with him *Paul E. Allen,* for father, appellee.

OPINION BY WATKINS, J., April 16, 1958:

These are appeals from the order of the Court of Common Pleas of Crawford County, granting custody of a minor child, Kathleen Della Newel, to her father, John B. Newel, who had instigated the habeas corpus proceedings against Adam Mason and Blanche Mason, husband and wife, the latter, by blood, her paternal grandmother.

At the time of the action the child was in the custody of the Masons, and after its institution the mother of the minor, Elaine Eddy, became an intervening respondent, so that the court below had the problem of determining a contest for custody involving the grandmother, the mother and the father. In this opinion we will so designate the parties.

The facts concerning the parties to the litigation are indeed complicated and we are constrained to say that all of the parties fall short of the expected standards that courts would like to find in deciding custody cases.

The child was born on July 19, 1951 so that at the time of the order on April 18, 1957 she was almost six years old, and at the present time, being still with her grandmother, the appeals acting as a supersedeas, almost seven years old. The respondent, Blanche Mason, is the mother of the relator, John B. Newel. She has been married four times. Her first husband, James

Shiner, was the father of the relator. He died and she married Stavey, with whom she had five children. He also died and she married Richards. This proved an unfortunate marriage and ended in divorce. She married her present husband, the respondent, Adam Mason, in 1942 and they have lived together happily since that time. The Masons have a good reputation and admittedly provided a good home for the child; and gave her such love and care that they were clearly in loco parentis.

Blanche Mason consented to the adoption of her son, John B. Newel, who took the name of his adopted parents. He was born July 10, 1929 and his father died thirteen months after his birth. She explains her consent to the adoption of Newel, as well as later placing her other five children in homes, on the economic situation and her unfortunate marriage to Richards. Newel's adoption took place when he was 28 to 30 months old. However, despite the adoption, Newel kept in touch with his natural mother and prior to his marriage visited her constantly, lived with her at different times and still refers to her as "mom". Mrs. Mason is 55 years of age.

Adam Mason was married and divorced before he married Blanche Mason. He is 59 years of age, a carpenter by trade and a good provider. His children by his prior marriage are married. The Mason household consists of the respondents and the child.

It certainly cannot be said from the record that John Newel, who is 28 years of age, had a good record as a father and husband. He and his wife separated in December, 1952 and about Christmas of the same year the minor child was left in the custody of the Masons. The Newels were divorced in the fall of 1953 and in January 29, 1954 the relator married Sylvia Raye, who is 35 years of age and the mother of 4 chil-

dren by her previous marriage. She was divorced from her husband in 1950. Three of the children, aged respectively, 11, 14 and 16 reside with the relator and his wife, who have moved to Parker, Yuma County, Arizona where they operate a 24-hr. diner and where they intend to take the minor child to live. Elaine Newel Eddy, the intervening respondent, after the divorce in the fall of 1953, married Terrance Eddy and they have one child, now two years old. Mrs. Eddy had an illegitimate child by a man named Grundy, which was conceived between the divorce and remarriage. This child now 4 years old lives with the Eddys.

With this kind of record it seems clearer than ever that all the relationships involved must bow to the principle enunciated by this Court in the recent cases of *McNamee v. Jackson,* 183 Pa. Superior Ct. 522, 132 A. 2d 396 (1957) and *McDonald v. McDonald,* 183 Pa. Superior Ct. 411, 132 A. 2d 710 (1957), where it was held in the latter case, at page 525 that: "It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being."

The minor in this case was about one and one-half years old when she was left with her grandmother and since that time up to the present date has been reared by her. It has been admitted that during that time she has had a good home and has been well cared for. At her impressionable age we certainly must consider the severe emotional effect of pulling up the roots of the environment to which she has become accustomed, in sending her thousands of miles away to a home described as inaccessible, to live with and among strangers. See *Com. ex rel. Children's Aid Society, Gdn., v. Gard,* 362 Pa. 85, 66 A. 2d 300 (1949).

The home to which this order sends the child is in Yuma County, Arizona and the letter to the Probation office of Crawford County from the Department of Welfare of Arizona is indeed interesting. It states that "Parker is in an inaccessible portion of Yuma County" and that an informal investigation disclosed that Newel operates the Midway Cafe. It further states that the Newels "spend many more hours working in the cafe than is good for either of them". They are living in quarters in the rear of the cafe which the writer was told would be adequate for themselves and one or two children. The letter further states that "the climate in this area is extremely mild and that during the summer months it is considered the local custom for most people to sleep on screened porches or out of doors".

We agree with the court below in disposing of the mother's claim to custody. Her sudden change from appearing as a witness for the Masons, and her desire that the custody of the child remain with them, to an intervening respondent, smacks of nothing more than an attempt to thwart the possibility of her former husband obtaining custody. There is nothing in the record of her conduct to recommend any consideration of her petition. It may be true that she has reformed but it would certainly take more time than has passed since her marriage to Eddy to determine the permanence of the reformation.

The relator's contribution to the support of his child from December 25, 1952 to the date of the hearing amounted to $25 and according to the record only $5 of this amount was for the support of his child, the other $20 was a repayment of a debt. The evidence did not disclose any contribution by the mother. It might be further noticed that until the institution of this action neither parent paid any attention to this child, so that the course of conduct by both the mother and

father of the child amounted to almost complete aban-
donment.

There was certainly a pattern of extreme neglect
and lack of parental interest by both parents from De-
cember 1952, until just before the time of the hearing.
The record certainly sustains the position that, of the
parties involved, the Masons were the best fitted for
custody. The court below made a point that their age
was a consideration that weighed his opinion. It may
be true that they may discover a busy, active teen age
girl needs the care of younger, vigorous parents but be-
fore the Masons get to that age, the child will have
reached the age where she can decide for herself with
whom she would rather be.

Custody orders have always been subject to modi-
fication and the facts that the new marriage of the fa-
ther has existed only since 1954; that he and his wife
were both married before and divorced; the difference
in age of his new wife; the ages of the children that
make up the home; the apparent crowded condition of
the home; the new business venture out in the wilds
of Arizona; the time that is needed to be given by the
father and his wife to the business, if it has a possi-
bility of success; all these things seem to emphasize,
that at least for the present and until more time passes
to test this marriage and the new business venture, the
welfare of this child can be best served by remaining
in the home she knows and has learned to love, with
the Masons.

Recognizing the rule that prima facie the parent is
entitled to custody and that great weight must be given
to the trial court's judgment because he had the oppor-
tunity to evaluate the fitness of the parties, we are still
of the opinion that it would be to the best interest of
this child to remain with the Masons. To paraphrase
Judge WOODSIDE's statement in *McDonald v. McDon-*

*ald,* supra, at page 416, by permitting this child to remain with the Masons, we are not gambling with her future welfare and happiness as we would be doing were we to compel her to live with her father and present wife in Arizona.

The order is reversed and it is ordered and decreed that Kathleen Della Newel remain in the custody of Adam and Blanche Mason.