## Commonwealth ex rel. Willouer *v.* Willouer et al., Appellants.

Argued March 22, 1960. Before Rhodes, P. J., Gunther, Wright, Woodside, Ervin, Watkins, and Montgomery, JJ.

Order affirmed.

*Maurice L. Epstein,* with him *William G. Schrier,* for appellants.

*Donald Reuter,* for appellee.

Opinion by Watkins, J., June 15, 1960:

This is an appeal by Ida Mary Willouer, mother of Barbara Catherine Willouer, the minor child, and Edith Pardoe, maternal grandmother of the minor child, respondents-appellants, from an order, in a habeas corpus action, in the Court of Common Pleas of Bradford County, awarding custody of the minor child

to her father, James F. Willouer, the relator-appellee herein.

The parties were married October 28, 1951. Barbara was born on March 17, 1952, and at the time of the hearing and order was 7 years of age. At the time of the marriage the respondent was 17 years of age and although the record is silent as to the relator's age, the court below, from his appearance, concluded that he too was very young at the time of the marriage. He is employed as a letter carrier at a rate of $2.14 cents an hour and earns approximately Five Thousand ($5000) Dollars annually.

They first went to live on a farm in Sullivan County owned by the relator's parents and used by them for summer and vacation visits. While on this farm, and shortly after their marriage, disagreements arose so that the respondent left her husband for short periods on several occasions. When Barbara was only a few months old the respondent left him and went to live with her parents. He then took the child to his sister's home so that there would be someone to care for the child.

It was at this time that the respondent brought the first habeas corpus action involving the custody of Barbara, but the court evidently was successful in reconciling the parties, because they returned to the farm. In August, 1952, the parties sold their personal property at the farm, and in November 1952 they purchased a home in Levittown which was ready for occupancy on January 1, 1953. While living in Levittown, the respondent got a job as a waitress, working from 4:00 p.m. until 12:00 p.m., in a diner. All the customary household chores and the care of the child were performed by the relator. They quarreled about the respondent's late hours and neglect of the child and she left him. He then took the child with him to live with his parents in Philadelphia. This was in the summer of 1953.

The respondent and her mother took the child away from the home of the relator's parents to Towanda, Bradford County, Pennsylvania and in November of 1953, the second habeas corpus action for the custody of Barbara was brought by the father. The child, at that time, was only one year and eight months old and the court gave custody of the child to the mother. The parties again reconciled but the maternal grandparents refused to give up Barbara. The third habeas corpus action for her custody was brought by the present relator and respondent against the maternal grandparents in Bradford County. The court awarded custody of the child to the parents.

Because the Levittown home was rented, they took the child to live temporarily with the paternal grandparents in Philadelphia. Within three weeks and just before the child's second birthday, March 17, 1954, the mother left again. For a time she continued to work at the diner in Bristol and came to see Barbara approximately once a month but afterward her employment changed to such places as Miami Beach, Florida, Red Bank, New Jersey and Binghamton, New York, and she saw less and less of the child. For the period of one entire year neither her family nor his family knew of her whereabouts, so that inquiry was made at the missing persons bureau at City Hall, Philadelphia, Pa.

This situation may well have continued if the respondent had not sustained a back injury, as a result of a fall, at her place of employment, for which she is receiving workmen's compensation and because of which, in May 1959, she returned to recuperate in her parents' home in Towanda, Bradford County, Pennsylvania. In August of the same year she asked the relator to permit Barbara to visit in Towanda for two weeks. She then refused to permit her return. This resulted in the present and fourth habeas corpus action

involving this child. It was brought in September 1959, and on September 18, 1959, the court below made the order awarding custody to the relator father.

In determining the question of the custody of a child, it seems there is no dispute in the law that the paramount consideration is the welfare of the child and all other considerations, including the rights of parents, are subordinate to the child's physical, intellectual, moral, spiritual and emotional well being. *Com. ex rel. Newel v. Mason,* 186 Pa. Superior Ct. 128, 140 A. 2d 365 (1958).

It is also an equally well established principle of law that, as a general proposition, the needs of a child of tender years, such as Barbara, are best served by her mother, and unless there are compelling reasons to the contrary, such child should be committed to the care and custody of her mother. *Com. ex rel. Schofield v. Schofield,* 173 Pa. Superior Ct. 631, 98 A. 2d 437 (1953).

For situations where we have determined such compelling reasons to exist see: *Com. ex rel. Cleary v. Weaver,* 188 Pa. Superior Ct. 197, 146 A. 2d 374 (1958); *Com. ex rel. Mitchell v. Mitchell,* 186 Pa. Superior Ct. 347, 142 A. 2d 304 (1958); *Com. ex rel. Newel v. Mason,* supra; *Com. ex rel. Buell v. Buell,* 186 Pa. Superior Ct. 468, 142 A. 2d 338 (1958); *Com. ex rel. McDonald v. McDonald,* 183 Pa. Superior Ct. 411, 132 A. 2d 710 (1957). A mother's right is not absolute and the rule that a young child should be served by its mother may not be carried further than the circumstances require.

We are inclined to give great weight to the findings of Judge JAMES W. CULLEN, of the court below, who had the opportunity of seeing and hearing the parties and their witnesses and, therefore, is in a much better position to pass upon their credibility and character

than we are in examining this cold record. As Judge WRIGHT said in *Com. ex rel. Mitchell v. Mitchell,* supra, at page 351, "We are not empowered to nullify the fact-finding function of the hearing Judge, particularly where the credibility of witnesses is involved."

In regard to credibility the court below said, "The Court was not favorably impressed as to the credibility of the mother, not only from her manner of testifying, but also the evasiveness in some of the testimony. The father testified that there were long periods of time when no one knew where the mother was and that the maternal grandmother called the father to learn if he knew. Neither the mother nor the maternal grandmother denied the testimony of the father on page 12 that the maternal grandmother had gone to the police for help in locating her daughter.

"The father testified that the mother made three visits to a psychiatrist upon the recommendation of the family doctor and then refused to return saying that they intended to put her in a hospital. This was not denied by the mother."

In regard to the home that was provided for this child at Disston Street, Philadelphia, during most of her lifetime, the court below said, "The paternal grandparents did not appear at the hearing, but the witness, Mr. James Donaghy, testified as to his familiarity with the home of the paternal grandparents, the character of the father and paternal grandparents and of the care and attention given to the child. The Court was impressed with the witness and with his testimony and, together with the other testimony in the case, believes it to be sufficient to establish that the child has had a good home during the years she has been with her father and that it would be a proper place for the child to be if custody should be awarded to the father. . . . In any event we have a young child who has had a

permanent home with her father and has received the care and attention which has to be a continuing every-day action. So far as the record goes, the mother has made no effort during this four years, or more, in which she has been traveling about the country, to provide the continuous and every-day care that an infant needs."

The court below answered the question raised by the fact that the child expressed a preference to be with her mother, as follows: "The child expressed a preference to be with her mother and gave as a reason that she was not allowed by her father to play outdoors or indoors at all the time she desired and that she was disciplined by him. She also stated that she had to walk about seven blocks to school in Philadelphia, but at her grandparents' home in Bradford County, she would ride on a school bus. There is nothing in the record to indicate any abuse of the child by the father and on the contrary, the appearance of the child and the testimony in the case would indicate she had received proper care. It would be normal for a child of this age to object to discipline and to prefer living in a rural district.

"The child has been deprived of her mother's care and attention and therefore is unable to make any comparison between the treatment she has received from her father and what she might receive from her mother; however, the evidence would justify a comparison unfavorable to the mother since she made little or no effort to contact the child or to be with the child during these early years when the mother would normally have a clearer right to custody."

We gather from this record that the real respondent in this case is the maternal grandmother. From early in March 1954, until August 1959, the child was continuously in the care of the relator, and in fact from

the date of the child's birth until the time of final separation in March of 1954, the respondent gave little time to the care of the child that could support the contention of her great mother love. While the child was a babe in arms, she left her in the care of her father; in the care of the relator's sister; in the care of the paternal grandparents; and in the care of the maternal grandparents. We can infer from the fact that it was necessary for the reconciled parents to bring a habeas corpus action against the maternal grandparents to get possession of their child, in the past, that when this traveling mother finally came home to recuperate from an injury, that the moving spirit to regain possession of the child was the grandmother corespondent. The court below may well have concluded and most likely did, that from the record made by this mother respondent, when her injury was finally healed, she would begin traveling again, leaving the child in the possession of the grandmother.

Our review of this record clearly establishes that Judge CULLEN arrived at his judgment only after a careful and sympathetic study and consideration of all the testimony, and that the circumstances in this case provided him with justifiable and compelling reasons to conclude that the welfare of Barbara was best served by an award of custody to the relator father.

Order affirmed.