Stapleton et al., Appellants, *v.* Dauphin County Child Care Service et al.

372

Argued November 16, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent).

*Lawrence G. Frank,* with him *Thomas W. Scott, Smith B. Gephart,* and *Killian & Gephart,* for appellants.

*William J. Madden, Jr.,* with him *Howard L. Bozarth,* for appellees.

OPINION BY SPAETH, J., June 21, 1974:

This proceeding concerns the custody of a five year old child named Brent. The proceeding was initiated, and the appeal is taken, by Samuel T. and Audrey Stapleton as Brent's foster parents. Brent was born August 13, 1968, to appellees Elwood and Lynne M. Leitzel, but on November 22, 1968, he was removed from their home by appellee Dauphin County Child Care Service. This was done on a petition by the Child Care Service alleging that Brent and his brother were "dependent children . . . because of the mental and physical condition of the mother."[1] Brent was then placed with foster parents (apparently not the Stapletons) until April 25, 1969. At that time he was returned to the Leitzels, with whom he lived until August, 1969, when the Service again removed him, placing him with the Stapletons on August 22, 1969. After a determination by the court below of dependency, permanent custody of Brent was formally granted to the Service on January 30, 1970. Brent lived with the Stapletons until the present action was concluded in the court below. On October 10, 1973, the Stapletons, under the threat of a contempt citation, returned Brent to the Service.

Thus during his first year of life Brent spent seven months, in two intervals, in the custody of his natural parents, the Leitzels, and five months in the technical custody of the Child Care Service and the actual custody of foster parents. He spent his next four years in the technical custody of the Service and the actual custody of the Stapletons.

---

[1] Opinion of Judge LIPSITT at 1. Although all of the facts concerning placement of Brent before 1973 are not strictly of record in this case, Judge LIPSITT's statements of the facts will be relied upon for purposes of this appeal. Judge LIPSITT has supervised the placement of Brent since November 22, 1968.

This proceeding began as an effort by the Stapletons to prevent the Child Care Service from removing Brent from their home and returning him to the Leitzels. The Service had brought no formal action but apparently had notified the Stapletons that it intended to exercise its "rights" as legal custodian and return Brent to the Leitzels. In response, on April 26, 1973, the Stapletons filed with the Juvenile Division of the Court of Common Pleas of Dauphin County a pleading captioned as the present case and labeled "Petition for Rehearing." This petition went unanswered. However, on May 2, notice was served on the Stapletons that Brent would be removed from their home on May 4, which was without the normal two weeks' formal notice and before the hearing that had been scheduled on the "Petition for Rehearing." In response to this notice, the Stapletons on May 3 filed a "Petition for Retention of Possession and Control of Foster Child." Judge Lipsitt thereupon ordered that custody remain with the Stapletons until a hearing could be held.

On May 29, 1973, the Child Care Service answered the Stapletons' petition for rehearing. The gist of the answer was that the Stapletons "have no standing . . . to assert any right to a rehearing with respect to the legal custody granted to the Dauphin County Child Care Service" (¶ 9), and that the discretion of the Service "is not subject to question by [the Stapletons] who are, in fact, agents or instrumentalities of the agency itself in achieving the best interests for the welfare of the child" (¶ 11).

The Stapletons responded to this in a pleading to the effect that the "contract" they had signed with the Service was unenforceable insofar as it limited any legal standing they might otherwise have, that as the *de facto* parents for four years they did have standing as parties in interest, that any change in Brent's custody would constitute an abuse of discretion by the Service,

and that the Service "has acted in the instant case only for its own self-protection, and the best interests and welfare of Brent have been subordinated" (¶ 11).

On July 9, 1973, a hearing was held before Judge LIPSITT. It is not quite clear whether this hearing was regarded as on the Stapletons' "Petition for Rehearing" alone or as also on their "Petition For Retention of Possession and Control of Foster Child." In any event, on August 14, Judge LIPSITT denied "the petition" and "directed that the minor child, Brent Leitzel, be returned to the Dauphin County Child Service in pursuance of its arrangements for return of said child to his natural parents."

In the opinion accompanying his order Judge LIPSITT discusses the evidence regarding the Leitzels and the Stapletons, and the care that Brent had received. Without summarizing this discussion, it is enough for present purposes to note that the judge's conclusion was that "[i]f only the question of custody was at issue, and the best interests of the child received paramount consideration, the Court could readily determine that young Brent would obtain greater advantages and benefits with a family such as the Stapletons rather than the Leitzels." (Opinion at 4-5.) The judge went on, however, to say that "[t]he nub of [the case] is the question whether this evidence of contrasts between the families is of any relevance." (Opinion at 6.) He concluded that it was not, and that "the Stapletons are at best volunteers who did an outstanding task in raising a child placed with them." (*Id.*)

In reaching this conclusion the judge acknowledged the parties' respective arguments regarding the Stapletons' standing. He decided, however, that "it would perhaps be best for this Court to cut through the procedural log jam caused by this question of the Stapletons' legal standing and consider the propriety of this suit in Juvenile Court." (Opinion at 4, footnote omit-

ted.) On this, the judge said: "The Stapletons accepted the child with knowledge of the terms of the agreement and received money compensation for their services. The agreement also provided the Stapletons were not to institute any proceedings with a view to adoption or placement. While a child's custody should not rest alone upon a contract and a child regarded as a mere chattel, the natural parents have natural rights and obligations and are entitled to their child. Under the present Juvenile Court Act, Section 1, 11 P.S. §50-101, it is expressly stated that the unity of the family whenever possible is to be preserved. The family itself is an institution whose sanctity must be preserved. The state has an interest in establishing minimum standards of care for a child's well-being, but the statutes involving juveniles were never intended to provide a procedure whereby children were to be taken from their parents except in the most necessary circumstances. The opinion in Rinker Appeal, 180 Pa. Super. 143 (1955) delineates the difference between an ordinary habeas corpus custody case where individuals are contesting for the placement of children and a juvenile court case. The Court points out that in a habeas corpus proceeding, the state acts as an arbiter between parties but in a juvenile court action where a child is declared deprived (formerly either neglected or dependent), the state is both the arbiter and a party. As such, the juvenile court is not empowered to take away any rights from the natural parents, or to determine what is for the best interest of a child, or to simply improve the condition of a child. The state is and should be restrained in removing a child from its parents except under the most unusual conditions." (Opinion at 8-9.)

## I

The opinion of the court below may be read as assuming *arguendo* that the Stapletons have standing to

protest the removal of Brent from their home. Whether they do, however, is an issue of considerable importance. It should therefore be decided expressly.

This issue must be decided under the new Juvenile Act, Act of December 6, 1972, P. L. 1464, No. 333, 11 P.S. §50-101 *et seq.* The Juvenile Act applies to this case because the Stapletons' petitions were filed on April 26, 1973, some two months after the effective date of the Act. Although the original adjudication of Brent's dependency was made under the Juvenile Court Law, Act of June 2, 1933, P. L. 1433, 11 P.S. §243 *et seq.,* Section 40(a)(1) of the Juvenile Act, 11 P.S. §50-337(a)(1), repeals the Juvenile Court Law "absolutely." This repealer became effective sixty days after enactment, or February 4, 1973. The effect of the repealer is to prevent the Juvenile Court Law from governing actions brought years hence simply because an action regarding the child in question had been brought before February 4, 1973. To hold otherwise would be to allow the Juvenile Court Law to linger in our jurisprudence perhaps until 1994, when the last party to an action under it would be twenty-one years old.

Section 6 of the Juvenile Act, 11 P.S. §50-302, provides:

"A proceeding under this act may be commenced:

"(1) By transfer of a case as provided in section 7 [11 P.S. §50-303; this section pertains to certain criminal proceedings];

"(2) By the court accepting jurisdiction as provided in section 33 [11 P.S. §50-330; this section pertains to ordering out-of-state supervision] or accepting supervision of a child as provided in section 35 [11 P.S. §50-332; this section pertains to a child placed on probation or protective supervision by a juvenile court of another state]; or

"(3) In other cases by the filing of a petition as provided in this act. The petition and all other documents in the proceeding shall be entitled 'In the interest of ————————————————, a minor,' and shall be captioned and docketed as provided by rule of the Supreme Court."

Although the Stapletons' petitions are not correctly entitled, they nevertheless "commenced" a "proceeding." They therefore represent one of the "other cases" contemplated by subsection (3) of Section 6 of the Juvenile Act. The question, therefore, is whether they were filed "as provided."

This question is answered by Section 17 of the Juvenile Act, 11 P.S. §50-314, which provides:

"A petition, which shall be verified and may be on information and belief, may be brought by any person including a law enforcement officer. It shall set forth plainly:

"(1) The facts which bring the child within the jurisdiction of the court and this act, with a statement that it is in the best interest of the child and the public that the proceeding be brought and, if delinquency is alleged, that the child is in need of treatment, supervision or rehabilitation.

"(2) The name, age, and residence address, if any, of the child on whose behalf the petition is brought.

"(3) The names and residence addresses, if known to the petitioner, of the parents, guardian, or custodian of the child and of the child's spouse, if any. If none of his parents, guardian, or custodian resides or can be found within the State, or if their respective places of residence address are unknown, the name of any known adult relative residing within the county, or if there be none, the known adult relative residing nearest to the location of the court.

"(4) If the child is in custody and, if so, the place of his detention and the time he was taken into custody."

It is difficult to see how standing could have been defined any more broadly. Brent was within the jurisdiction of the court below. The Stapletons are "any persons." They therefore had standing to file a petition raising the issue of who should have custody of Brent.

What appears to have caused the confusion in this case is that the distinction between a party's standing and the court's standard of review has been overlooked. The fact that a stranger to the child ("any person including a law enforcement officer") has standing to file a petition with respect to the child implies nothing about the standard that the court will apply in deciding what action to take on the petition. It may well be that upon examination of the petition and of the evidence, if any, the court will conclude that the petition should be dismissed as of no merit.

. Throughout the Juvenile Act the distinction between a party's standing and the court's standard of review is made plain. While Sections 6 and 17 speak of standing in the most general terms, other sections impose strict requirements of proof. Thus the court may not take a child from the parents against their will except in "[p]roceedings in which a child is alleged to be delinquent or deprived." §3(1), 11 P.S. §50-103(1).[2] In appraising such allegations and the evidence submitted in their support, the court is not free to apply a general standard, as for example "the best interests of the child," but is confined by restrictive definitions of who is a "delinquent child," §2(3), 11 P.S. §50-102(3), or a "deprived child," §2(4), 11 P.S. §50-102(4). In addition to these specific restrictions, the court is subject to the general restrictions that although the Juvenile Act is intended for the care and protection of children, it

---

[2] There are certain other limited cases not pertinent here, such as criminal cases and cases involving a child from another state. §§3(2), (3), and (4), 11 P.S. §§50-103(2), (3), and (4).

is also "[t]o preserve the unity of the family whenever possible," §1(b)(1), 11 P.S. §50-101(b)(1), and its purposes are to be achieved "in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety," §1(b)(3), 11 P.S. §50-101(b)(3). *And see generally Commonwealth ex rel. Benson v. Wayne County Child Welfare Service,* 198 Pa. Superior Ct. 329, 181 A. 2d 850 (1962).

Later in this opinion it will be necessary to consider what is the appropriate standard in a proceeding such as this one. It is sufficient for the moment to observe that whatever the standard, the Stapletons had standing under Sections 6 and 17 of the Juvenile Act, 11 P.S. §§50-302, 50-314, to bring the proceeding.

## II

When the Stapletons received Brent from the Child Care Service, Mrs. Stapleton executed a one-page form document entitled "Placement Record." The document briefly describes Brent and the terms of the custody arrangement, and contains the following provision: "The Agency in placing this child reserves the right to remove him at its discretion and no other removal is authorized. Any action for adoption or guardianship must have the consent of this agency." The opinion of the court below mentions this agreement, although it does disclaim any reliance upon it; appellees urge it in their brief as virtually conclusive.

At least as to the Child Care Service, it is surprising that this argument should be made. One would expect the Service to be aware that such a contract is voidable by the courts when the best interests of the child conflict with it. Restatement, Contracts, §583.[3] "The basic

---

[3] "BARGAIN FOR CUSTODY OF MINOR CHILDREN

"(1) Except as stated in Subsection (2) a bargain by one entitled to the custody of a minor child to transfer the custody to

error in the argument made in behalf of the claim of the Society for custody of the child because of the Society's 'rights' under the contract is that the child is treated as a chattel[4] without any rights in respect to its own happiness and physical well-being. That a child cannot be made the subject of a contract with the same force and effect as if it were a mere chattel has long been established law." *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 92, 66 A. 2d 300, 304 (1949). *Accord: Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa. Superior Ct. 556, 307 A. 2d 411 (1973) ; *Commonwealth ex rel. Berg v. The Catholic Bureau,* 167 Pa. Superior Ct. 514, 76 A. 2d 427 (1950) ; XV Williston, Contracts, §1744A (1972).

The Stapletons' standing is not affected, nor can they be estopped to proceed with this action, because of the document they signed.

### III

It will be recalled that Judge LIPSITT for the court below found that the evidence showed that it would be in Brent's best interests to place him in the Stapletons'

---

another person, or not to reclaim custody already transferred of such a child, is illegal unless authorized by statute.

"(2) A bargain by one parent to transfer the custody of a minor child to the other parent or not to reclaim such custody is not illegal if the performance of the bargain is for the welfare of the child.

"*Comment:*

"a. Like marriage, the custody of a young child is of importance to the State. It is not a property right of the parents. The court may, if it is for the welfare of the child, enforce the bargain, but will not do so otherwise. Where a child is adopted in accordance with law the rules stated in the Section have no application."

[4] "A similar error was basic in the majority opinion in the historic case of Dred Scott v. Sandford, 19 Howard 393 (1857) ...." [Footnote in original.]

custody, but that he concluded that this evidence was legally irrelevant and that he therefore could not be guided by it.[5] The judge was frank in expressing his distress with this result, saying at the outset of his opinion that "[a]mong the few unpleasant burdens which fall upon a Trial Judge is the responsibility to determine the fate of a young child." In fact, however, the judge was not in the dilemma he supposed. The evidence of what would be in Brent's best interests was not irrelevant but defined the standard that should have been applied to the case.

The court below conceded that if this case were one of the usual habeas corpus proceedings, "which deal with contracts between parents and relatives . . . [or] when there has been a struggle between foster parents and the natural parents over a child who has been given for adoption," Opinion at 6, the standard to be applied would be what was in the child's best interests. However, the court asked: "[S]hould the law appropriate to habeas corpus proceedings and custody decisions as between individuals be made applicable to this type of situation? Are the circumstances in fact so changed as to be different from any routine placement by a social agency?" Id. at 7.

It is understandable that the court should have asked these questions, for they are prompted by the manner in which the parties have argued the case. Nevertheless, the questions do not accurately state the issue presented. Although this case is not the habeas corpus proceeding normally encountered in a child custody case, neither is it a routine placement by a social agency.

The best way to define the nature of this case is to examine the alternatives open to the Stapletons from

---

[5] See supra, page 376, for quotation of the court's opinion.

the time they received notification of the Child Care Service's intent to remove Brent from their custody.

First, the Stapletons might have defied the Service's request. In that event, the Service could have sought to regain custody of Brent by filing a petition for a writ of habeas corpus. *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 66 A. 2d 300 (1949).[6] The suit would be captioned "Commonwealth ex rel. Dauphin County Child Care Service v. Stapleton." The Leitzels could have done likewise. *Commonwealth ex rel. Berg v. The Catholic Bureau,* 167 Pa. Superior Ct. 514, 76 A. 2d 427 (1950). The Service would have standing under *Gard* to bring the habeas corpus action as a court appointed legal custodian; the Leitzels would have standing under *Berg* because the natural parents have standing to seek to regain custody of their child. The standard to be applied would be the same as in any other custody case brought by petition for writ of habeas corpus: "the best interest and welfare of the child," *Commonwealth ex rel. v. Wilcox,* 118 Pa. Superior Ct. 363, 365, 179 A. 808, 810 (1935).

Second, the Stapletons might have voluntarily turned Brent over to the Service. In that case, however, under *Commonwealth ex rel. Ebel v. King,* 162 Pa. Superior Ct. 533, 58 A. 2d 484 (1948), they would have been relegated to the position of "mere stranger or volunteer" and would have had no standing to come forward as relators to seek a writ of habeas corpus.

Given these alternatives, the Stapletons' decision to seek a legal determination of their status with respect to Brent by filing a petition under the Juvenile Act,

---

[6] Note that if the Service proceeded against the Stapletons under the Juvenile Act by petition alleging that Brent was "deprived" or "delinquent" while under the Stapletons' care, the petition would evidently have been dismissed on the merits, at least so it appears from Judge Lipsitt's finding that the Stapletons gave Brent excellent care; nor does it appear that the Service contends otherwise.

in the meantime obtaining a stay order enabling them to retain custody of him, was a responsible course of action, which the courts should encourage rather than discourage. In fact, such a procedure has been allowed before in *Ciammaichella Appeal,* 369 Pa. 278, 85 A. 2d 406 (1952), in which the foster parents were allowed to intervene and litigate at all stages of a proceeding for reconsideration of a placement order brought by the natural mother and her husband against the child care agency. There is no important difference between allowing the foster parents to intervene, litigate, and appeal, and allowing them to bring the petition in the first place when their relationship to the child is threatened in the same way as was the Ciammaichellas'.

It follows from these considerations that although the Stapletons' petition was not, and could not be, a petition for a writ of habeas corpus, the standard to be applied in deciding the petition should have been the same as would have been applied had it been a petition for a writ of habeas corpus. This was the standard applied in *Ciammaichella Appeal, supra,* where the court "[a]fter . . . careful review . . . independently arrived at the . . . conclusion . . . that the welfare of this child is best served in the home of [his] mother and sister." *Id.* at 287, 85 A. 2d at 411. There is no reason to hold that one standard applies if a child care agency seeks to regain custody of a child by filing for habeas corpus, but that a different standard, less advantageous to the child, applies if instead the foster parents initiate the proceeding by petition under the Juvenile Act.

The reliance by the court below on *Rinker Appeal,* 180 Pa. Superior Ct. 143, 117 A. 2d 780 (1955), was misplaced. In that case this court emphasized the difference between a habeas corpus proceeding and a proceeding to declare a child "neglected" (now "deprived"). This court, per Judge WOODSIDE, said:

"It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. Yet, of course, there are cases where such authority must be exercised for the protection and welfare of children.

"Under our system of government children are not the property of the state to be reared only where and under such conditions as officials deem best. On the other hand the state is interested in establishing a minimum standard of care for a child's physical, intellectual and moral well being. . . .

"A child cannot be declared 'neglected' merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

"The power of the juvenile court is not to adjudicate what is for the best interests of a child, but to adjudicate whether or not the child is neglected. Rose Child Dependency Case, 161 Pa. Superior Ct. 204, 208, 54 A. 2d 297 (1947).

. . .

"In habeas corpus cases involving the custody of children the contest is between two people usually parents or relatives. It seldom involves people who have not been at some time in a parental relationship to the child. In these cases the government acts as an arbiter

between the parties and determines with whom the child's interests will best be served.

"An action to have a child declared neglected is a contest between the state and the parent or person having custody of the child. The state becomes both arbiter and party. In order that justice may be done, it is necessary that juvenile court judges exercise their power with caution, for the restraint that is upon them is limited largely to self restraint." *Id.* at 148-49, 117 A. 2d at 783-84.

There can be no quarrel with this forceful statement. However, it is not in point. This is not a proceeding to take a child from the parents, whether by having the child declared "neglected," "dependent," "delinquent," or "deprived." That proceeding occurred before the Stapletons entered the scene, when on the petition of the Child Care Service the court below declared Brent a "dependent" child and took him from his parents' custody. It was then that the Commonwealth appeared as a party in a proceeding "between the state and the parent," and then that the court below was required to exercise "extreme care" and to take the child from the parents "only where the evidence clearly establishes its necessity." In the present proceeding, this standard no longer applies. This is so because the reasons for the standard, which have been so well stated by Judge WOODSIDE, no longer exist. The family, which the standard is designed to protect, has already been wrenched apart; the unity that was being protected has been destroyed. The Commonwealth no longer appears as a party in a contest between the state and the parents but rather as an arbiter, who is required to decide only what is in the best interests of the child. Accordingly, that is the only question that the court below should have asked itself.

This declaration is neither repugnant nor even new to Pennsylvania law. In *Commonwealth ex rel. Chil-*

*dren's Aid Society v. Gard, supra,* a child care agency, acting on the instructions of a child's natural mother, sought to remove the child from the foster parents with whom she had been placed and to place her in another foster home. The agency's argument was the same as the argument made by the Child Care Service here: we have legal custody; the foster parents are mere volunteers; neither they nor the court should interfere with our judgment. This argument was not warmly received. The Supreme Court affirmed the decision of this court leaving custody with the foster parents. In an opinion by MR. CHIEF JUSTICE MAXEY, the court recognized that ties of blood may weaken and concentrated its attention on what would be in the child's best interest: "To take this nearly 65 months old girl . . . away from the only parents she has known since she was an infant of eighteen months would be exactly the same in its effect on her and on the man and woman who have stood in a parental relationship to her for nearly four years as would the separation of any well cared for child from its own parents. Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process." *Id.* at 97, 66 A. 2d at 306.

This court unanimously reaffirmed the principles enunciated in *Gard* only one year ago in *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa. Superior Ct. 556, 307 A. 2d 411 (1973). That case involved a nine year old girl who had been in the foster parents' home since she was three weeks old. Again the position of the child care agency was that it was the sole arbiter of what was in the child's best interests. We rejected that position and reversed the order granting custody to the agency, remanding for a complete hearing: "The

continuous custody of Charlene with appellants for all but the first three weeks of her life, and the emotionally devastating effects which could result from a forced separation are matters which should be seriously weighed in determining the child's best interests." *Id.* at 562, 307 A. 2d at 414 (1973).

There are a number of cases not so directly on point as *Gard* or *Bankert* but in which a non-parent has prevailed in a custody battle precipitated by a parent. These recognize that any presumed natural rights of the parents are subordinate to the best interests of the child.[7] In most of them the court assumed that a natu-

---

[7] *See Com. ex rel. Galloway v. Galloway*, 188 Pa. Superior Ct. 313, 146 A. 2d 383 (1958) (affirming award of custody to paternal uncle and aunt against challenge by natural mother) ; *Com. ex rel. Newel v. Mason*, 186 Pa. Superior Ct. 128, 140 A. 2d 365 (1958) (foster parents win over natural father) ; *Com. ex rel. Kraus v. Kraus*, 185 Pa. Superior Ct. 167, 138 A. 2d 225 (1958) (affirming award of custody to natural mother) ; *Com. ex rel. McDonald v. McDonald*, 183 Pa. Superior Ct. 411, 132 A. 2d 710 (1957) (grant of custody to petitioning natural father reversed on appeal by paternal aunt) ; *Com. ex rel. Shroad v. Smith*, 180 Pa. Superior Ct. 445, 119 A. 2d 620 (1956) (natural grandparents win over natural father) ; *Com. ex rel. Shamenek v. Allen*, 179 Pa. Superior Ct. 169, 116 A. 2d 336 (1955) (affirming award of custody to natural aunt and uncle over challenge by natural father) ;*Com. ex rel. v. Cook*, 122 Pa. Superior Ct. 397, 186 A. 229 (1936) (reversing grant of custody to natural father and returning child to foster father with whom he had lived for ten years) ; *Com. ex rel. v. Wilcox*, 118 Pa. Superior Ct. 363, 179 A. 808 (1935) (affirming grant of custody to foster parents against challenge by natural father and step-mother). In *Com. ex rel. Bradley v. Bradley*, 188 Pa. Superior Ct. 108, 146 A. 2d 147 (1958), an order granting custody to the foster parents over challenge by the natural grandparents, who were supported by its natural parents, was affirmed on appeal. The opinion quotes favorably from the lower court's opinion, suggesting that the result would have been the same had the natural parents been parties of record : " 'The [grandparents] and the [foster parents] stand, therefore, upon an equal footing before this Court. Other things being equal, we would still be inclined to favor the blood relative. But

ral parent is entitled to custody over any other person unless "compelling reasons" appear. This standard, it will be observed, is not so strict as the "clear necessity" standard enunciated in *Rinker Appeal, supra.* Thus the cases illustrate how the presumption in favor of the natural parents may weaken with the passage of time.

Another context in which "strangers" have retained custody against the wishes of the natural parents is adoption. Thus, once abandonment has been proved, the standard to be applied in adoption is lowered: "The longer the responsibility continues to be discharged capably by the foster parent, the stronger become the ties that form out of the new relationship until there comes a time—possibly, not long deferred,—when the welfare of the child may justly require that the parental responsibility be allowed to remain where the abandoning parent has willingly permitted it to be." *Davies Adoption Case,* 353 Pa. 579, 588, 46 A. 2d 252, 256- 257 (1946). *Accord, Commonwealth ex rel. Williams v. Price,* 167 Pa. Superior Ct. 57, 74 A. 2d 668 (1950) (abandonment brings mother down to equal status with foster mother).[8] Similarly, it has been held that the failure of the foster parents who wish to retain custody of a child to prove abandonment does not mean that the natural parents will automatically get the child back on a writ of habeas corpus. The standard applied is the best interests of the child. *See Commonwealth ex rel. Ruczynski v. Powers,* 206 Pa. Superior Ct. 415, 212 A. 2d 922 (1965), and *Petition of Su-*

---

other things are not equal. We cannot overlook the eight (8) years of loving care, voluntarily and sacrificially bestowed on this boy by the [foster parents] and the resultant bond of affection between them.'" *Id.* at 111-12, 146 A. 2d at 149.

[8] Nothing in this opinion is intended to suggest that the Leitzels abandoned Brent. The cases dealing with abandonment are cited only to illustrate how the fact of time spent with foster parents may weaken the natural parents' claim to custody.

*lewski*, 113 Pa. Superior Ct. 301, 173 A. 747 (1934) (foster parents granted custody in both cases despite prior adjudication that child had not been abandoned).

Thus it will be observed that although child custody cases have arisen in a variety of situations, they are consistent with the following propositions: A child will be taken from the parents only on proof of "clear necessity." In deciding whether there has been such proof, the court will not appraise the evidence according to the child's "best interests." However, once the child has been taken from the parents, the court will appraise the evidence, and award custody, according to the child's best interests. In applying this standard the court will recognize the natural parents' claim to custody. In a given case this claim may prove of decisive weight; the particular circumstances of each case, including such facts as the length of time the child has been separated from the parents, must be taken into account.

To an extent these propositions may seem mere word-play. It might be said that in fact the two standards are one: that when due consideration is given to the importance of a stable family, it is in the child's "best interests" for the court not to take custody from the parents except upon "clear necessity." As a matter of logic this may be so. As a matter of practice, however, it is useful to state the standards separately. It impresses the trier of fact and the parties with the importance of protecting the family from intrusion by the state. At the same time, it recognizes that the child's situation is fundamentally different when, as here, that intrusion has occurred.

## IV

Since the court below has found that it would be in Brent's best interests if he were to be with the Staple-

tons, it might seem that this court should simply enter an order directing Brent's return to the Stapletons. There are, however, two reasons why that would not be appropriate.

The first reason is that the statement by the court below regarding Brent's best interests is not a finding of fact but *dictum*. As has been discussed, the court was uncertain regarding the Stapletons' standing, and it believed that in any event the evidence regarding Brent's best interests was not relevant. With these issues now clarified, the matter should be heard again.

The second reason is that the Juvenile Act grants Brent certain procedural rights. Section 20 of the Act, 11 P.S. §50-317, grants "a party" the right to "representation by legal counsel at all stages of any proceedings under this act." This right may be waived by a child's parents, guardian, or custodian unless "their interest may be in conflict with the interest or interests of the child."

It will be observed that there is no limitation of the right to representation by counsel so far as the nature of the "proceeding" is concerned. Since sometimes in the Act when procedural safeguards are provided the nature of the proceeding is specified,[9] it must be concluded that no limitation to the right to counsel is to be implied so as to exclude it in the present case.

To say that the child is merely the subject of the proceeding, not a "party" to it, would be to return to the child-as-chattel mentality. (Part II, *supra.*) Brent is just as much a party to this case, which will deter-

---

[9] For example, Section 21(b), 11 P.S. §50-318(b), states that "a child charged with a delinquent act need not be a witness against or otherwise incriminate himself." The immediately preceding subsection, which is not limited to a delinquency proceeding, provides: "A party is entitled to the opportunity to introduce evidence and otherwise be heard in his own behalf and to cross-examine witnesses." §21(a), 11 P.S. §50-318(a).

mine his future, as he would be if he were seventeen years old and charged with shoplifting and the proceeding were a delinquency proceeding.[10]

Nor can anyone waive Brent's right to counsel. The purpose of the hearing will be to determine what is in his best interests. To confer power to waive counsel, whether on the Leitzels, the Stapletons, or the Child Care Service, would be to prejudge the case, since it would amount to a determination that that party's interests were in accord with Brent's best interests.[11] What is in Brent's best interests remains to be decided.

The order of the court below is reversed so that the court may appoint counsel for the child and conduct a new hearing in conformity with this opinion.

HOFFMAN, J., concurs in the result.

WATKINS, P. J., dissents.

WRIGHT, P. J., and SPAULDING, J., did not participate in the consideration or decision of this case.

---

[10] See In Re: Adoption of R. I., 455 Pa. 29, 312 A. 2d 601 (1973) (mother has constitutional right to counsel on petition by prospective adoptive parents for involuntary termination of parental rights).

[11] The Child Care Service in its brief claims that it is the repository of the child's best interests: "Brent Leitzel is in the legal custody of the Dauphin County Child Care Service. He has been adjudicated a neglected and deprived child. His welfare and best interests have been delegated by the Court to the Dauphin County Child Care Service. They have continued to exercise this delegated power and right under the law." No authority is cited for these propositions. There is nothing in the Juvenile Act that allows a court to delegate its power in such a manner. The assertion of such power is at least troublesome where the Service claims "rights" to the child because the child is neglected but wishes to exercise these "rights" to return the child to the family that once neglected him without a rehearing by the court that entered the original order.