## Johnson Adoption Case.

Argued April 21, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

*John Deutsch,* with him *Deutsch & Wyatt,* for appellant.

*Roger N. Nanovic,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, June 3, 1960:

From the time that Mark Randolph Johnson was three years of age he has been neglected by his father Stanley R. Johnson, and now that Mark is nine years of age, his father objects to his adoption by respectable, conscientious, and children-loving persons who will give Mark the home, care, maintenance, devotion and education which his own parents have so far denied him.

Mark Randolph Johnson was born January 11, 1950 of Stanley Johnson and Glendora Johnson. On November 9, 1953, Glendora Johnson charged her husband with neglect and refusal to support their children, including Mark, and the Court of Quarter Sessions of Carbon County ordered Stanley Johnson to pay a certain amount weekly for their support. On January 4, 1955, a citizen of Carbon County, Edward Beers, informed the juvenile court of that county that Stanley Johnson had abandoned his wife and children. L. R. Campbell, probation officer of Carbon County, made an investigation into conditions at the Johnson home. He testified: "I made a visit out there and found that there was real neglect of the children there. It was only Mrs. Johnson and her children living there. It was hardly a fit place for anyone to live in. There was hardly any food in the house; there was no furniture in the house; the windows were out of the place; and it was bitter cold, because it was in the Wintertime."

The juvenile court entered an order placing the children (there were nine of them) in the custody of their grandmother, Mrs. Adam Johnson, with whom Stanley Johnson was now making his home. The job of taking care of nine children of tender age, feeding, clothing and instructing them, keeping them out of mischief and out of each other's hair is one that would appall a woman of superior robustiousness and of a

younger age than Mrs. Johnson, who was then seventy. Stanley Johnson became aware of the yoke of care fastened around the neck of his aged mother and decided to alleviate her burden by departing. His magnanimity in this respect was established by his own testimony: "Q. Now, will you state, under what circumstances you left your mother's home? A. She began to complain, and she said: 'She had too much work'. Q. What did you do when she began to complain? A. There wasn't anything too much I could do. Q. You just packed up and left your mother's home? A. That's right. Q. And you left the children with your mother? A. Yes. Q. You just left your mother's home? A. I moved out because there was too much work for my mother to do with everybody being there. I thought 'it was better for me to get out of the house and let the kids stay with my mother.' Q. You thought that if you left that that would relieve your mother of work? A. Yes, to a certain amount."

It never occurred to Stanley Johnson that he could have considerably reduced the burdens and worries of his mother by remaining with her, helping her to wash, feed, and clothe his multitudinous brood.

By June, 1956, Grandmother Johnson realized that the task of managing, guiding, and maintaining nine children was too much for her advanced age and she made arrangements to place her son's numerous offspring in the homes of various families. It was the lot of Mark Johnson to come to rest in the home of Purie F. Green, Jr., and his wife Arlene A. Green, both of whom instantly demonstrated a solicitude and care for the child and lavished upon him the attention which is the divine right of every child.

On April 3, 1957, the Court of Quarter Sessions of Carbon County, after due investigation, officially placed Mark, as a ward of the court, in the Green home for care and maintenance.

On January 30, 1958, Mr. and Mrs. Green petitioned the Orphans' Court of Carbon County for the adoption of Mark Johnson. Stanley Johnson opposed the petition and the matter came on for hearing. The court found that Mark Johnson had been abandoned by both his parents in 1956, and that the abandonment continued to the date of the hearing. On July 10, 1959, the court decreed the adoption of Mark by the petitioners and ordered that from that date the child should be known by the name of Mark Randolph Green, in accordance with our Act of adoption.

Stanley Johnson has appealed, contending that he had never abandoned Mark and that the court, in any event, had no jurisdiction over the case. It would probably not be impossible, but it would require a rather fertile imagination to conjure up a case where the facts of abandonment are more clearly and decisively established than they are in this case. While Stanley Johnson's opposition to the adoption of his child and his efforts in an appellate court to reverse the decreed adoption do credit to his parental instinct, they inevitably arouse wonderment as to the reason for his delay in displaying attachment for his son.

From the year of 1953 until the day of the hearing on the adoption, every page of the record reveals Stanley Johnson's attitude of unconcern as to the comfort, care and destiny of his boy Mark. So lacking was Stanley Johnson in appreciation of his parental responsibilities that even his mother, out of a painful devotion to truth, felt compelled to bare her son's inexcusable neglect. She testified: "Q. Did Stanley Johnson ever care for Mark Johnson in your home? A. No. . . Q. You were caring for Mark in the home where you live, you and your husband? A. That's right. Q. What did Stanley do for Mark, so far as his welfare was concerned? A. Well, I sent the boy to school. The first year he was at my place, he went to kindergarten.

I got no money from the boy's father. Q. Did you feed the boy? A. Yes. Q. Was he clothed by you? A. Yes. Q. You provided everything for his general physical upkeep? A. Yes. Q. *Was anything done by your son, Stanley Johnson, for the boy?* A. *No.*" (Emphasis supplied.)

Stanley Johnson was not partial to his boy Mark, insofar as neglect was concerned. He was equally unconcerned about the welfare of his other eight children. Up to the date of the hearing in orphans' court he was $6,464 in arrearages on the order to support his manifold progeny.

In the face of this irrefutable evidence of neglect, Johnson still asserts that he did not refuse to support Mark. It was testified that on one occasion he did offer a check to the Greens in behalf of Mark, but the Greens refused to accept the check because it was signed by Helen Meckes, described in the record as Johnson's "girl friend."

Johnson not only did not support Mark but he brought him no clothing and brought him no gifts, with two exceptions. On one of Mark's nine birthdays, Johnson gave him "a toy truck and gun" and on one Christmas he sent him a sled with a card which read: "From Stanley Johnson and Helen Meckes." But a truck and a sled were hardily the vehicles on which Johnson could ride into a position of parental authority after he had blasted away all bonds of authority with the gun of many years' neglect.

On two or three occasions Johnson stopped by the Green home to talk to Mark. With these exceptions Johnson displayed in no way the parental devotion which is synonomous with fatherly authority.

To say that Johnson does not love his child would be to say too much because no father can extirpate from his heart every root of tenderness for his own flesh and

blood, but abstract love is not enough to discharge the legal reponsibilities which a father owes to his child.

The appellant argues, and properly so, that: "Abandonment [within adoption statutes], is a matter of intention, to be ascertained by what a parent says or does, viewed in the light of the particular circumstances of the case." *Peter Adoption Case,* 177 Pa. Superior Ct. 365, 110 A. 2d 825. It is precisely on that basis that the lower court correctly decided that Johnson had abandoned his son.

We will now consider the contention advanced by the appellant that the Orphans' Court of Carbon County had no jurisdiction over the subject matter of this lawsuit because at the time of the adoption proceedings, Mark was living with his foster parents in Monroe County, and not Carbon County; also that Johnson himself lived in Monroe County. Geographically it is true that Mark was not in Carbon County when the adoption proceedings began, but he was physically in Monroe County only because of the order of the Court of Quarter Sessions of Carbon County which placed him there. On January 14, 1955, he became a ward of the Carbon County Court which granted the Greens "care and maintenance" of the child, the care and maintenance being paid by Carbon County.

The Adoption Act, as amended (Act of June 5, 1941, P. L. 93, §1, 1 PS §1, as amended, provides: "It shall be lawful for any adult person desirous of adopting any person . . . to present his or her petition to the court of the county where he or she may be a resident, *or in the county in which the person to be adopted is a resident,* upon allowance by the court in that county, or upon allowance by the court in the county in which is located the approved agency or institution, or any of their branch offices, which placed the person for adoption, declaring such desire . . . ." (Emphasis supplied.)

It is clear that under the Act the Orphans' Court of Carbon County had jurisdiction to decree the adoption. Adoption proceedings may be held in the court of the county where the petitioner is a resident or in the county in which the child to be adopted is a resident. Ordinarily a child's residence follows the domicile of his parent or guardian. But, in a case, such as this, where the child is a ward of a court of quarter sessions, which has placed him temporarily in the custody of someone outside the county for care and maintenance, the domicile of the child is in the county of the court of which he is a ward. *Shaw Adoption Case,* 381 Pa. 107, 112 A. 2d 352, 354; *Brown's Adoption,* 25 Pa. Superior Ct. 259.

Though the Greens and Stanley Johnson were domiciled in Monroe County at the time the orphans' court took up the case, the child's domicile was neither that of the petitioners nor that of his natural father. Since he was then a ward of the Court of Quarter Sessions of Carbon County he continued to be subject to its jurisdiction until that order was revoked. At the time of the court's order both Mark's father and mother, though separated, were domiciled in Carbon County, and the child was domiciled with his father.

In September, 1955, Stanley Johnson removed from his mother's home and took up residence in Monroe County. The child, however, remained in Carbon County. When, in April, 1957, Grandmother Johnson asked to be relieved of the custody of Mark and the other Johnson children, the court ordered: "Now, to wit, this third day of April, 1957, after due hearing, Mark Johnson is found to be a Dependent Minor Child and *in need of the care and protection of the Court* and should be placed in a suitable home *for care and maintenance,* and an investigation being made of the surroundings and condition of the home of Purie F. Green, Jr., and

Arlene Green, . . . by the Probation Officer who has advised that this is a suitable home in which to place a child for care and maintenance . . . it is the Order of the Court that Mark Johnson, Dependent Minor Child, be placed in the care and custody of Purie F. Green, Jr., and Arlene Green . . ., there to be fully maintained at the expense of the County of Carbon, and they are to receive the sum of $8.00 per week for his care and maintenance." (Emphasis supplied.)

It is thus clear that Mark was a ward of the Court of Quarter Sessions of Carbon County, and continued to be so with only temporary possession being given first to his grandmother and father, and then to the Greens. At all times this possession was given only with the permission of the Carbon County court and by its orders.

In a similar situation this Court said in the case of *Ciammaichella Appeal,* 369 Pa. 278, 287: "The Juvenile Court in the first instance unquestionably had jurisdiction of the minor as a dependent child when it committed it to the Catholic Children's Bureau. *While this order, confirmed by its later order of December 23, 1947, was in full force and effect, the minor remained within the jurisdiction of the court.*" (Emphasis supplied.) If the father wished to oust the Court of Quarter Sessions of Carbon County of jurisdiction over his son, he should have petitioned that court for a revocation or modification of its order, alleging facts entitling him to such revocation or modification. (Section 16 of Juvenile Court Act of June 2, 1933, P. L. 1433, 11 PS §258.) There can be no question, therefore, that Mark Randolph Johnson was still subject to the jurisdiction of the Juvenile Division of the Court of Quarter Sessions of Carbon County, and it necessarily follows as a corollary of this fact that the child's domicile was, by operation of law, Carbon County.

Nor did the child's domicile become that of the Greens. The child was placed with them only for care and maintenance, the costs of which were to be borne by Carbon County. The child could have been removed from the Green home by the Carbon County court at any time. In *Black v. Graham,* 238 Pa. 381, this Court held that dependent children committed by the juvenile court to the care of certain persons did not thereby become subject to the guardianship of the person into whose care they were committed nor did the latter sustain parental relations to them so that their residence became the residence of the children, entitling the children to admission in the public schools of the school district in which the persons caring for them resided.

The fact that the natural father's domicile is Monroe County is immaterial. Though ordinarily the domicile of the parent would be the domicile of his minor child, in this case the child was a ward of the Carbon County court when that court admittedly had jurisdiction in the matter by virtue of the domicile of the parents and child in Carbon County. From that point on, the father could not oust the court of Carbon County of its jurisdiction over the child merely by removing himself from Carbon County. To hold otherwise, would mean that the father could render the Carbon County court order ineffectual and meaningless merely by removing himself from that county.

Therefore, we conclude that the orphans' court of that county had jurisdiction to decree his adoption, though we do so for reasons other than those relied upon by the court below.

Decree affirmed, costs on appellant.