445 A.2d 1314

In the Matter of the ADOPTION OF David Lynn
STURGEON, a Minor.

In the Interest of David Lynn STURGEON.

Appeals of CLEARFIELD COUNTY CHILDREN AND YOUTH
SERVICES and Winfield Scott and Donna Scott.

Superior Court of Pennsylvania.

Argued Oct. 15, 1981.

Filed May 28, 1982.

Toni M. Cherry, DuBois, for appellants.

John A. Burkhiser, Oil City, for participating parties.

Before WIEAND, JOHNSON and MONTEMURO, JJ.

MONTEMURO, Judge:

This case concerns the adoption of a young child, David Lynn Sturgeon, who has been placed in two different adoptive families by an agency with undisputed legal custody of the child. Certain aspects of the case arose in Clearfield County and other aspects arose in Venango County, so that this court on appeal must deal with a tangled jurisdictional situation as well as with the human tragedy involved. Because the facts are unusual, we shall summarize them briefly, before embarking on a full discussion in the body of this opinion.

Winfield Scott and his wife, Donna Scott, (Scotts) are residents of Clearfield County, Pennsylvania. James L. Beck and his wife, Virginia M. Beck, (Becks) are residents of Venango County, Pennsylvania. The Clearfield County Children and Youth Services (Clearfield Agency) placed David Lynn Sturgeon, (David), the subject of this litigation, with the Scotts for the purpose of adoption. Before the adoption became final in Clearfield County, the Agency removed David from the Scott home and shortly thereafter placed him with the Becks in Venango County, again for the purpose of adoption. The court in Venango County, over the objections of the Clearfield Agency and private counsel for the Scotts, awarded custody of David to the Becks and withheld a decision on the Becks' adoption petition pending the outcome of this appeal.

For the reasons that follow, we affirm the decision of the Venango County Court of Common Pleas to accept the

matter for hearing, to award custody to the Becks, and to dismiss all filings by the Clearfield Agency and the Scotts which would tend to obstruct the future adoption of David by the Becks.

## FACTS

David, the subject of this appeal, was born on January 10, 1978, in Clearfield Borough, Clearfield County. His father, David Lynn Easton, and his mother, Donna Louise Sturgeon, were twenty (20) and seventeen (17) years of age respectively at the time of his birth. They were young, single, and apparently not very much in love.

The baby initially resided with his mother, but both parents, on or about March 26, 1979, voluntarily placed David into the care and custody of the Clearfield Agency. On or about the same date, the Clearfield Agency placed the child in a foster home. On July 2, 1979, the parents of David filed a Petition for Voluntary Relinquishment of Parental Rights and Duties. The Clearfield Agency joined in said Petition and agreed to accept custody of the child until such time as the child was adopted or otherwise placed. (R.18a–23a) This petition was filed in the Court of Common Pleas of Clearfield County, Pennsylvania, Orphans' Court Division, and captioned: *In re: David Lynn Sturgeon*, d.o.b. 1–10–78, Number 1628. (R. 18a). On July 5, 1979, the Honorable John K. Reilly, Jr., President Judge of the Court of Common Pleas of Clearfield County, entered an order awarding temporary custody of the child to the Clearfield Agency pending a final resolution of the Petition which he scheduled for August 29, 1979. On or about July 11, 1979, the Clearfield Agency removed the child from temporary foster care placement and placed him with the Scotts, appellants herein, for the purpose of adoption. Although it is not clear from the record, (R. 25a), both sides agree that the Scotts on or about July 30, 1979, filed a "Report of Intent to Adopt" under the same court term and number as the Petition for Voluntary Relinquishment, *supra.* On August 29, 1979, Judge Reilly entered a final order forever terminating all parental rights and duties of the natural parents.

On October 31, 1979, the Clearfield Agency, through its caseworker, Ms. S. Jean Camberg, who had arranged for the child's placement with the Scotts, filed with the court in Clearfield County a "Report of Intermediary," to which was attached Clearfield Agency's consent to the proposed adoption by the Scotts (R. 28a–31a). It should be noted here that Ms. S. Jean Camberg resigned her position on the same date she filed the "Report of Intermediary", and her last home visit with the Scotts was on September 18, 1979. (N.T. 155)

At this point, if the usual and normal procedures in an adoption case had taken place, it seems clear that in all likelihood the Scotts would today be the adoptive parents of David. However, events subsequently transpired which gave rise to this litigation and appeal.

On January 4, 1980, after David had been with the Scotts for nearly six months, the Clearfield Agency received a telephone report of suspected child abuse concerning David. Mr. Dennis Caldwell, (Caldwell), a supervisor in the employ of the Clearfield Agency, the next day conducted an investigation of the report of suspected child abuse and presumably an investigation of the Scott home and their suitability to be adoptive parents.

According to his later testimony, Mr. Caldwell became gravely concerned about the placement during his visit to the Scott home. Chiefly, the basis for his concern was that he observed a most unusual lack of physical contact between Mrs. Scott and the two year old she intended to adopt. (N.T. Vol. 1, 78)

On the 8th or 9th of January, he re-visited the Scott home, and this time he interviewed Mr. Scott, Mrs. Scott being at a class she was required to attend as a result of a drunken driving charge. Mr. Scott and David appeared to have a better relationship, but in conversation Mr. Scott admitted to concern over raising the child and over his wife's inability to "settle down" and he discussed her continuing problems with the use of alcohol and marijuana. The child, again, was largely unsupervised, and although he would sit on Mr. Scott's lap, he would not hug or kiss him. (N.T. 81a–82a).

Supervisor Caldwell then planned a third visit to the Scott residence on January 15, 1980, this time asking a colleague, Mr. Endress, to help with evaluation. Prior to departure for the Scott home, Mr. Caldwell filed an amended Report of Intermediary with the Clearfield County Court, requesting an additional six months to supervise the placement before scheduling a final adoption. (R. 32a–33a)

Thereafter, he and Mr. Endress spent another two and one-half hours in observation of the situation and reached a determination that the Scotts were not suitable adoptive parents. The child seemed positively averse to Mrs. Scott; ... "the child would push her away and slap and hit her and kick her and anything a child that age would do that didn't want to be picked up." (N.T. Vol. 1, 86) Although Mr. Scott called the boy "my son" and seemed to notice when he wandered, Mrs. Scott seemed to be "unable to give anything to the child", showed no emotion toward him, felt she couldn't read to him, and was unwilling to give him crayons for fear he would scribble on the walls. (N.T. Vol. 1, 119–121)

Caldwell and Endress conferred and determined to remove David from the Scott home immediately. He was taken to a hospital for a check-up and placed in the hands of an experienced foster mother for temporary care.

Caldwell's testimony was that he informed the Scotts that David would be in foster care for ten days pending any legal action which the Scotts might decide to take concerning David's removal, and that if no such action was taken during the ten (10) day period, the Clearfield Agency would thereupon proceed to locate and place David in another home for purposes of adoption.

Mr. Scott's testimony stressed his understanding that the removal was based upon the original report of child abuse, which he knew was unfounded. He decided therefore to let the agency take David and "we'll get it straightened out." He also states that he was told that he had "no rights" and that "there was nothing we could do about it." (N.T. Vol. 2, 94)

Mr. Endress' testimony confirms that of both the supervisor and the adoptive father. He personally told the Scotts what he himself believed to be true: that he thought they probably had no legal right to David because the agency had custody of him, but that they should contact their attorney, and that no move would be made other than foster care for the next ten days. (N.T. Vol. 1, 127–128)

The next day, January 16, 1980, Caldwell personally advised Judge Reilly, the President Judge of the Clearfield County Court of Common Pleas, of David's removal from the Scott home, his reasons for taking that action, and the Agency's intention to seek a new adoptive home for David. Judge Reilly told Caldwell to wait ten (10) days, and if no petition was filed by the Scotts during that time, to go ahead and place the child in another adoptive home. (N.T. Vol. 1, 91). No legal papers were filed, however, by the Scotts or the agency, and the court took no official action *sua sponte*. There appears in the Record a mention of a meeting attended by Judge Reilly and the attorneys for the Scotts and the Clearfield Agency during the ten day period. (N.T. Vol. 1, 92)

On February 2, 1980, no appeal or petition having been filed by the Scotts, Clearfield Agency placed David for adoption with the Becks in Venango County. On the same date, Clearfield Agency and the Becks executed a Placement Agreement and said Agreement provided, *inter alia*, that "the finalization of this placement hinges on the legal consequences of the previous placement." (R. 75a)

On March 13, 1980, an Interagency Agreement in Adoption Placement was entered into between Clearfield Agency and Venango County Children and Youth Services (Venango Agency) which provided that the Venango Agency would supervise the adoptive home of the Becks and provide supervisory reports to the Clearfield Agency and notify Clearfield Agency of any changes in the status of the Beck adoptive home. (R. 74a).

On February 7, 1980, the Becks filed a "Notice of Intent to Adopt" in the Court of Common Pleas of Venango Coun-

ty, Orphans' Court Division, No. 49–1980. It appears from the Record that there was another meeting of counsel with Judge Reilly and supervisor Caldwell, after the Becks' Intention to Adopt was filed, and the placement of the child outside Clearfield County was discussed. (N.T. Vol. 1, 92–93)

It was not until March 4, 1980, *more than six weeks after David had been removed from their custody*, that the Scotts filed a Petition to Adopt David in the Court of Clearfield County. (N.T. Vol. 1, 99) The Clearfield Agency responded on March 25, 1980 with Preliminary Objections to that document, stating its belief that as custodian of David it had the power to withhold consent. (R. 41a)

The dockets in both Clearfield and Venango Counties are silent on the events of the next two months, but testimony of supervisor Caldwell disclosed that hearings on the matter were eventually scheduled, with the Scotts and the agency as the opposing parties (N.T. Vol. 1, 95–97). His impression, however, was that this was to be a court determination of the best interests of the child. He did inform the Becks of this in a relaxed informal way by telephone on May 15, 1980. On May 22, 1980, he visited the Beck household to review the child's adjustment. (N.T. Vol. 1, 96) It is clear that he was not alarmed by the situation and encouraged the Becks to feel secure in their proposed adoption.

At no time did the Becks receive official notification of the Clearfield proceedings, and their presence, either as a party or as witnesses, was never requested. They continued to feel secure in their belief that the agency's custody was unquestionable and that the scheduled hearings were a legal formality, to dispose of earlier legal proceedings.

Several hearings were held in Clearfield County on the matter, on dates that do not appear in this record, but apparently not until after the May 22, 1980 visit of Mr. Caldwell to the Beck home. Notes of Testimony from these hearings were not incorporated into the present Record. These hearings culminated in an Order of the Court of Common Pleas of Clearfield County, dated July 30, 1980,

which directed the Clearfield Agency to return physical custody of David to the Scotts for a further supervisory period of six (6) months, at the end of which the Clearfield Court would make a decision on the Petition for Adoption filed by the Scotts more than five (5) months earlier. (R. 87a) [1]

Representatives of the Clearfield agency attempted to comply with the court order. However, the Becks, at this point in time, had had David for only a few days less than six months themselves, and they were not inclined to be as compliant as the Scotts had been when demand for the child was made. They did not respond to Clearfield Agency's request, and the agency then filed a Petition for Enforcement Order on August 1, 1980. This was followed by a "Decree" issued on the same date by the Clearfield Court, directing the Becks to forthwith deliver physical custody of David to the agency. This was the first official mention of the Becks to appear in the Clearfield Court records, and although the Becks knew by this time that the child was being actively sought, they were on vacation and did not receive service for some days.

Their attorney, however, now filed their Petition for Adoption, dated August 4, 1980, in Venango County, under the same term and number as their Report of Intention to Adopt, the six months waiting period having elapsed.

On August 5, 1980, counsel for the Scotts filed a Petition with the Clearfield Court to have Donald Mitchell (Mitchell), the Administrator of the Clearfield Agency, and Caldwell held in contempt of court for not complying with the Clearfield Court's Order of July 30, 1980. On the same date, counsel for the Clearfield Agency filed a Petition with the Venango County Court requesting that court to hold a hearing and to direct the Becks to produce David at the hearing, and to show cause why David should not be turned

---

1. We note that this further supervisory period of six months was essentially what was requested in the January 15, 1980 Report of Intermediary filed by the agency shortly before the decision to remove David from the Scott household.

over to the Clearfield Agency, and to direct the Sheriff of Venango County to locate David and turn him over to the Clearfield Agency, or in the alternative, to the Venango Agency pending determination of the legal issues.

It is an interesting feature of this case that the agency which so opposed the adoption by the Scotts in Clearfield County had at this point, under court order, become a vigorous defender of its right to remove the child again and return him to the original pre-adoptive couple. However, testimony in the Venango hearings clearly shows that the agency remained convinced that the best interests of David lay with the Becks. (N.T. Vol. 1, 100, Vol. II, 54)

On August 11, 1980, the Becks filed yet another Petition, this time for custody of David, and the Venango County Court then scheduled a hearing for September 23, 1980 on the Becks' petitions as well as the Clearfield agency's petition. On August 26, 1980, counsel for the Scotts filed a Petition to Quash with Venango County, alleging that Venango County lacked jurisdiction to hear the matter. This was incorporated into the scheduled hearing.

The evidentiary hearing began as scheduled on September 23, 1980; the court stated that it would handle the jurisdictional issue and the custody issue and other related matters, but would not rule on adoption at that time. The court was not able to hear all the testimony on September 23, 1980, and continued the proceeding to October 17, 1980.

On September 25, 1980, the Clearfield Agency filed Preliminary Objections to the Becks' Petition for Custody, together with an Answer and New Matter. On October 8, 1980, the Clearfield Agency, and the Scotts, requested the Venango court to issue a Writ of Habeas Corpus directed to the Becks. The Venango court agreed to hear argument on all these matters, filed subsequent to the first hearing, on October 17, 1980, the date of the continued hearing.

On December 11, 1980, the Venango Court of Common Pleas, Honorable William E. Breene, President Judge, entered the following Order which is the subject of this appeal:

1. The preliminary objections by Clearfield County Children and Youth Services in the nature of a demurrer to the petition for adoption filed by James L. Beck and Virginia M. Beck are dismissed.

2. The petition of Clearfield County Children and Youth Services for custody is refused.

3. The petition of Toni M. Cherry, attorney for Winfield Scott and Donna Scott, to quash for lack of jurisdiction the petition filed by James L. Beck and Virginia M. Beck, is dismissed.

4. The petition for a writ of habeas corpus filed by Winfield Scott and Donna Scott is dismissed.

5. The petition for custody filed by James L. Beck and Virginia M. Beck is granted and the general custody of David Lynn Sturgeon is awarded to James L. Beck and Virginia M. Beck.

6. Hearing on the petition for adoption of David Lynn Sturgeon filed by James L. Beck and Virginia M. Beck shall be deferred pending disposition of an appeal from this order.

This appeal was filed January 8, 1981, and was argued before a panel of this court on October 15, 1981. We note that on that date David was 3¾ years old and had been in custody of the Becks for twenty-one months.

## DISCUSSION

 There are, clearly, a number of issues presented for resolution in this matter, the first being a decision as to the area of law into which the case falls. Despite features of the case which resemble a custody issue, the real matter for determination is adoption, and we shall decide the matter under provisions of the Adoption Act, 1 P.S. § 101 to 603, now repealed, Act of July 24, 1970, P.L. 620, No. 208, and appropriate case law.[2]

2. The final order of court appealed from in this case is dated December 11, 1980. Section 3 of the Act of 1980, Oct. 15, P.L. 934, No. 163 provides that proceedings in progress might be amended after January 1, 1981 to conform to the new act, but otherwise should be

The term and number of the matter in Clearfield County, Orphans' Court Division, was begun with a Voluntary Relinquishment, with a Report of Intent to Adopt, and with a Petition to Adopt. Similarly, in the Venango County Orphans' Court, the first filings under the court term and number were the Report of Intent to Adopt and the Petition to Adopt.

This matter does not closely resemble the "typical" custody matter, in which relatives of a child are contesting for primary control of the child's person; understanding, however reluctantly, that the opposing party has and will continue to have certain connections with the child. There are no issues of visitation or support. Under custody law it is possible to effect some legal "division" of the child. Like Solomon, however, we face a situation in which division of a child is impossible. Adoption is what is sought, and the award of custody appealed from is admittedly a temporary stopgap, and cannot be the arbiter of the legal issues involved.

■ The second issue is whether the court of Venango County had the right to accept this case. That breaks into several subdivisions of jurisdiction, venue, and comity.

As to venue, there can be no doubt that both Clearfield and Venango counties have a legitimate claim to decide the subject matter of this adoption.

Section 202 of the Adoption Act states *inter alia* that proceedings in relinquishment and adoption may be brought in the county where the parents, the adoptee, or the person who files a Report of Intent to Adopt resides, or in which the custodial agency is located. There is nothing implying that more of the listed requisites for venue makes one county more suitable than another: any one connection is sufficient.

concluded under the provisions at 1 P.S. § 101 to 603. This action was never amended and therefore must be analyzed under former law.

The Commonwealth of Pennsylvania has undoubted jurisdiction to decide matters of adoption within its borders, and within that jurisdiction, the legislature may determine venue. When we give full meaning to the statutory language of § 202, we are obliged to conclude that both Clearfield and Venango Counties had jurisdiction and venue to decide this case.

However, we must now examine the facts and law to determine whether Venango County, coming later into possession of the case, was obliged to defer to the jurisdiction of Clearfield County. For the following reasons, we hold that it was not so obliged.

For the reasons discussed above, we do not feel that the Child Custody Law of this Commonwealth is applicable, and therefore the extensive provisions of that statute pertaining to judicial restraint in the face of court action by a sister state are inapplicable. We note, however, that each of these sets of pre-adoptive parents received this child legitimately from the custodial agency, as is usual. Cases in adoption rarely if ever present problems of child-snatching and forum-shopping among parties who know each other and are vulnerable to each other. It is understandable, therefore, that unlike custody law, adoption law does not provide particular safeguards to prevent such behavior. There was, therefore, no special onus on the Venango County court to defer to Clearfield County.

Still, we must examine the laws of this Commonwealth which concern conflicts among courts. A review of this area is set forth in *In re Estate of R.L.L.*, 487 Pa. 223, 409 A.2d 321 (1979). There, the Supreme Court faced a conflict in which one common pleas court had awarded custody to a mother as against a father, and a second court had thereafter awarded guardianship to the paternal grandparents as against the mother. There, too, the court, upon appeal, concluded that jurisdiction and venue was proper in both lower courts, and examined instead the doctrines of "*res judicata* with its components, merger and bar", and "its offshoot, collateral estoppel." *Id.*, 487 Pa. 228, 409 A.2d at 323.

The court concluded that under the facts of *Estate of R.L.L.*, none of the above precepts applied, as they rest upon the final judgment rule. The binding effect of any judgment is only as to the parties to the action or those in privity with a party.

The facts of the instant case are stronger, for the court in *Estate of R.L.L.* conceded that the grandparents in the second action might have been considered as being in privity with their son, who was defeated in the first action. Here, however, the Becks were not only not parties in the first action but also had interests that were far from identical with those of the Clearfield Agency; additionally, as the most recent custodians of a very young child, they were knowledgable on issues absolutely pertinent to the interests of that child. The Clearfield court was not in a position to deal finally with David's interests without the testimony of his recent caretakers and reports of his present development.

There was thus no "final judgment" rendered in Clearfield County from which the doctrines of *res judicata* or collateral estoppel could be asserted to prevent litigation in Venango County, which named different parties to the action and which incorporated up-to-date testimony as to the child's progress.

Venango County properly decided to hold hearings in depth on the best interests of the child David whose adoption was properly within its jurisdiction and venue, where the order of its sister county was determined between different parties and was not firmly based upon the child's best interest.

Yet another issue to be disposed of is the claim of the Clearfield Agency that their placement agreement with the Becks mandated the return of the child to them on demand. This court has expressed surprise before when faced with an agency's assumption that a contractual agreement as to custody of a child remains binding upon the parties.

In *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974), a child had been placed

with foster parents at age one, after a finding of dependency, and remained in the foster home until age five. The foster parents, like the Becks in this instance, had executed an agreement with the agency, and, unlike the Becks, had been receiving support for the child. That case was decided under the Juvenile Court Act, 11 P.S. § 50–101, which is not applicable to the instant facts, as custody of David was not received by the Clearfield Agency on a finding of dependency but after voluntary relinquishment proceedings.

However, there are legal principles that apply equally in both instances.

It has long been settled in this Commonwealth that a child is not a chattel, to be finally disposed of by agreement among parties. The *Stapleton* court remarked rather sharply that:

> One would expect the [agency] to be aware that such a contract is voidable by the courts when the best interests of the child conflict with it. Restatement, Contracts, § 583. *Id.*, 228 Pa.Super. at 381, 324 A.2d 562.

█ We reiterate at this time that an agreement of this type is voidable. Persons standing *in loco parentis* to a child *are not bound by such an agreement when they sincerely feel that it no longer serves the child's best interests.* Clearly, where foster parents have been held to the right to petition for custody of a child, pre-adoptive parents cannot have less right to protect the interests of the child entrusted to them as a prospective son or daughter and heir.

█ The law as to adoption in Pennsylvania is well-settled: a child may be adopted if its parents have had their parental rights terminated, either by consent or involuntarily. *Once this prior adjudication has been made* and the rights of the natural parents are no more, *the best interest of the child becomes the criterion by which a court must be guided.* See *e.g. In re Adoption of Jacono*, 426 Pa. 98, 231 A.2d 295 (1967).

In the instant action, the natural parents voluntarily relinquished their rights in the child, and custody was legally

in the agency before either set of adoptive parents filed their Intent to Adopt. From the moment that the State, in the guise of the court and the agency, assumed the custody of this child, it also assumed an obligation to exercise its powers in *David's* best interests. This was the sole standard for any decision on his adoption, and it is one that should be applied on full facts elicited during hearings in which all pertinent facts are placed before the court.

The Venango Court was therefore correct in scheduling hearings before permitting David's removal from the Beck household, on the Beck's petition stating that such a hearing was in David's best interests, despite the opposition of the Clearfield agency.

This is not to say that the agency does not have important powers *vis a vis* a child entrusted to its legal custody. The Adoption Act carefully provides for a six month waiting period before finalization of an adoption, in part for the purpose of monitoring the adoptive home. Section 335 specifically demands a court-ordered investigation after the filing of any Report of Intent to Adopt.

Section 321 gives the agency powers of consent to marriage, military service, and major surgery and to exercise authority "as a natural parent." Section 401 mandates filing of a Report of Intermediary [an agency, where that body has custody] following the filing of Intention to Adopt, and § 411(4) lists the consent of a custodial agency as required for final adoption.

Obviously the legislature intended that the duties and the powers of custodial agencies be taken seriously during the adoption process. The provisions contemplate that occasionally initial placements may not develop well and that monitoring by an agency is necessary to assure the best interests of the child. Where such a situation does come to light, there is an obligation on the court and the agency to act, but to do so in an orderly and informed manner. Neither the Clearfield court nor the Clearfield agency handled the instant matter to assure the best interests of the child.

Apparently informal conferences including the court, the agency, and counsel for the Scotts were held after the first removal of the child, but these are shadowy reflections in the testimony on the Record, and we have no assurance that any balancing was made as to the probable effects of uprooting a child already slow to develop as opposed to the effects likely to result from poor parenting. Nor do we know what support systems might have been mobilized to train the pre-adoptive parents, who were never given their chance to explain their interpretations of hearsay evidence or to confront adverse witnesses. The agency's appraisal of the situation might or might not have prevailed had the matter been timely argued.

We can never know that now. We do know that David's future under present conditions is best served by the stability of his present home, and that must be the guide for this court. At the risk of being tedious, we reiterate that the nature of the review mandated at *any* hearing on adoption is solely that of the best interest of the child who is the focus of the action. Again, we have no record of notes of testimony to review from the Clearfield hearing, but it is an undisputed fact that the new pre-adoptive parents were not served, did not participate, and that David's present circumstances and development were at most mere hearsay in that court proceeding. The order that resulted from the Clearfield hearings demanded David's return "forthwith" from his home of the last six months. Not a single line of the order concerns itself with the way in which return would benefit the child.

We must conclude that the Clearfield court at this point accorded the Scotts rights nearly commensurate with those given natural parents before a finding of dependency. Although we sympathize with the shock and confusion of the pre-adoptive parents, as indeed the lower court must have done, they were not entitled at any time to the protections afforded a natural parent and could not acquire such protections prior to final adoption.

The state has a great interest in preserving the family unit, and there is a presumption that the child's interest, where feasible, is best served by remaining in that family unit. Once that link is severed—here, by voluntary relinquishment—preservation of subsequent family units must take second place to the best interest of the child. The Order of July, 1980 would be quite proper as a response to the legal necessity of intervention by the state to protect a child whose natural parents were too immature, untrained, or ill to give proper parenting. As a decision focused on David's best interests, however, it is fatally defective.

Thus, when the Becks turned to the court of their own county alleging that David's best interests lay in his adoption by them, the Venango County Court was correct in its decision to accept the case and to base its conclusions on full participation of all interested parties with a view to discovering the best interests of the child David. There was jurisdiction and venue in that court; there were no considerations of *res judicata* or *collateral estoppel* to impede its decision because of a final judgment by a sister court; the law of adoption puts no especial onus upon the courts of common pleas to decline jurisdiction such as is found in the law of custody; the claim of David's pre-adoptive parents that his best interests lay in adoption by them presented a valid issue for consideration. The Venango court was well within its discretion in accepting and determining the case.

As to the outcome of the case on the merits, we find that the opinion of the Venango Court paid careful attention to David's interests, first placing the Scotts and the Becks on "equal footing." The summation of the testimony was thorough and accurate, and the choice in favor of the Becks was fairly and reasonably arrived at, with David's needs always the primary focus.

Our review of that part of the Opinion will be brief, but we note that the court weighed the opinions of the staff of both the Clearfield and Venango agencies as to the relative parenting abilities of the two couples, and the record fully supports the trial judge's conclusion that the Becks were superior in this regard. Also seriously considered was the

testimony of a clinical psychologist who found that David was already a year behind his chronological age in development and made the informed prediction that *any* move, even to a perfect new environment, would retard the child's development another four to six months. Minor factors were Mrs. Beck's full time presence in the home as opposed to the swing-shift working schedules of the Scotts, and the advantage of an older brother in the Beck household.

Review of the record amply supports the decision of the Venango Court. We affirm all of its orders *re* David's interests, and we remand the case back solely for the purpose of concluding the final adoption of the child David Lynn Sturgeon by James and Virginia Beck. We do not retain jurisdiction.

WIEAND, J., files dissenting opinion.

WIEAND, Judge, dissenting:

This is a difficult and complex case. The decision of the majority has placed commendable emphasis upon the need to achieve promptly that stability which is promised by allowing the child to remain with the Becks in Venango County. I share the majority's concern for the best interests of the child and am almost persuaded to concur in the majority's decision.

However, the majority has overlooked the fact that the Court of Common Pleas of Venango County lacked jurisdiction to award custody or decree adoption of this child. David Lynn Sturgeon is a ward of the Court of Common Pleas of Clearfield County. It was the Court in Clearfield County which received and determined the natural parents' petition to relinquish the child; and it was the Clearfield County Court which, by court order, placed custody of the child in the Clearfield County Children and Youth Services. This agency stood in loco parentis to the child and was responsible for his welfare. The child's legal residence, therefore, followed the agency and has always been in Clearfield County. His legal residence was not changed to Venango County merely because the Clearfield agency placed him temporarily in the care of persons who resided in

Venango County. Under these circumstances the Venango County Court could not properly overrule the Clearfield County court order, remove custody from the Children and Youth Services in Clearfield County and, without its consent, award custody for purposes of adoption to temporary, foster parents in Venango County. *See Johnson Adoption Case*, 399 Pa. 624, 161 A.2d 358 (1960). *See also* Commonwealth Child Custody Act of April 28, 1978, P.L. 108, No. 47, 11 P.S. § 2401 et seq.[1]

Accordingly, I would reverse the order of the Court of Common Pleas of Venango County and return custody of David Lynn Sturgeon to the Clearfield County Children and Youth Services. I am confident that the Court of Common Pleas of Clearfield County will, in its determination, be as equally concerned for the best interests of David Lynn Sturgeon as this Court and the Court of Common Pleas of Venango County.

---

1. Now repealed and re-enacted as part of the Uniform Child Custody Jurisdiction Act of October 5, 1980, P.L. 693, No. 142, § 201(a), 42 Pa.C.S. §§ 5341–5366.