## In re Adoption of Kim Kee Young

*Samuel Totaro,* for petitioner.
*Paul Rosen,* for the agency.

SOKOLOVE, *J.,* September 7, 1994—This was a contested adoption. Keith Lussier sought to adopt the baby girl placed with him and his wife by Love The Children Inc., a Bucks County adoption agency, and then taken from him by the agency after the death of his wife. After hearings concluded on August 23, 1994, I entered findings of fact, conclusions of law and a decree of adoption in favor of Mr. Lussier. I further directed that the child be returned to Mr. Lussier. (The findings and conclusions are attached as an appendix to this opinion.)

The agency filed a direct appeal to the Superior Court. I am writing this opinion pursuant to Pa.R.A.P. 1925 to explain the reasons for my decision. Since the agency filed neither post-trial motions to the decree nor a statement of matters complained of on appeal, I will simply address the factual and legal bases of my ruling.

Briefly, the facts of this matter are as follows. The agency had approved Keith and Kimberly Lussier as adoptive parents of a Korean child early in December 1993. About a month later, before the child was placed in the Lussiers' home, Mrs. Lussier was suddenly hospitalized and underwent a hysterectomy. She was diagnosed with uterine cancer and began a course of chemotherapy. The Lussiers immediately notified Margaret (Marty) Cardona, the agency field representative, of Mrs. Lussier's illness and treatment. Ms. Cardona chose not to speak with Mrs. Lussier's physicians and did not review Mrs. Lussier's medical records. Furthermore, Ms. Cardona did not communicate with anyone else at the agency about Mrs. Lussier's condition.

While Mrs. Lussier was in the hospital for chemotherapy, the representative permitted the transfer of physical custody of the 4-month-old child to Mr. Lussier on February 25, 1994. The child remained at the Lussier home for the next five months. Throughout this time, the agency representative was aware that Mrs. Lussier was undergoing chemotherapy for her previously diagnosed cancer. Mrs. Lussier died on July 17, 1994. The agency removed the child from Mr. Lussier's care six days later. Before Mrs. Lussier's death, the agency had filed on behalf of the Lussiers a notice of intention to adopt and had advised them that an adoption hearing would occur in July or August.

Mr. Lussier filed both a petition for custody of the child and a petition for adoption. Hearing on these matters began August 9, 1994. At that time, I announced to the parties that I would decide this matter as expeditiously as possible. My primary concern was the disturbance in the life of a 9-month-old child, who had spent five of those months in one household. With this in mind, I made it clear to both sides that all pertinent

evidence should be provided at the next scheduled hearing, which was held on August 18, 1994 and then continued to conclusion on August 23, 1994.

I also made it clear that this was an adoption case. The custody of the child of necessity follows the decree of adoption. My separate order of custody was entered solely for the benefit of the child and of the family then having temporary custody of her. It was designed to allow for a convenient transfer of physical custody. Without such a custody order, Mr. Lussier would have been entitled to immediate custody of the child.

The legal issues of the case are not complex. The question can be stated simply as: Has the petitioner for the adoption satisfied the requirements of the Adoption Act, where the adoption agency has withheld its consent based on alleged violations of its contract with the adopting parents?

## I. PETITIONER'S BURDEN; NEEDS AND WELFARE

Counsel for the agency has argued that in rendering my decision I rejected the "best interests of the child" principle. On the contrary, I have applied the principle specifically as it is stated in the Adoption Act. Section 2902 (23 Pa.C.S. §2902) provides that the court shall enter a decree of adoption

"If satisfied that the statements made in the petition are true, [and] that the *needs and welfare* of the person to be adopted *will be promoted* by the adoption. ... (emphasis added)

I found that the needs and welfare of the child would be served by the proposed adoption. The agency apparently agreed, until the untimely death of Mrs. Lussier.

The agency misinterprets the application of "best interests." Every proposed adoptive family cannot be subject to comparison with a potentially "better" adoptive family. This would result in allowing adoption agencies to provide sparsely available babies to the most affluent (better?) bidders.

I recognize the exception of *Matter of Adoption of Sturgeon,* 300 Pa. Super. 92, 445 A.2d 1314 (1982), in which the Superior Court approved the comparison of two pre-adoptive families, where the child had lived with each family an equivalent amount of time. This case does not present such an exception. The Lussiers were the only family to have physical custody of the child in this country, until the child was wrongly and abruptly removed by the agency.

I am satisfied, as was the agency before Mrs. Lussier's death, that the proposed adoption by Mr. Lussier will benefit the child. That is all the law requires.

## II. AGENCY CONSENT

I further found that the agency had no basis in fact or in law to determine that there had been a significant change in circumstances justifying the withholding of its consent to the adoption by Mr. Lussier. First, the agency had notice of Mrs. Lussier's serious illness for several months before her death. In fact, the agency representative knew of the illness before the child had been placed with the Lussiers. Secondly, I concluded that the agency's stated pretexts[1] for determining that

---

1. The agency's only reasons for withholding its consent, apart from the two-parent condition, were assumptions as to what "must have occurred" with the mother dying of cancer and what "would occur" in the "mourning family," all made without any direct knowledge or evidence of the actual conditions in the home.

the Lussier household would no longer be an appropriate one were not justified by the facts as presented. On the contrary, I received testimony which indicated that the Lussier household would be appropriate in spite of Mrs. Lussier's death.

I decided that the agency had fragile justification for withholding its consent. I, therefore, exercised the discretion provided at 23 Pa.C.S. §2713(2) that,

"The court, in its discretion, may dispense with consents when the adoptee is under 18 years of age and has no parent living whose consent is required."

The Supreme Court has held that this provision gives "the court ... the final burden of determining whose consent is necessary." *In re Adoption of Hess,* 530 Pa. 218, 226, 608 A.2d 10, 14 (1992).

I found that the agency's consent to the adoption was unreasonably withheld under the circumstances of this case.

### III. BREACH OF CONTRACT; MISREPRESENTATION

The agency's representative in the Buffalo area, Marty Cardona, knew that Mrs. Lussier had had a hysterectomy resulting from uterine cancer and that she was undergoing chemotherapy. Despite this knowledge, the representative placed the child with the Lussiers and allowed them to proceed with the adoption by filing the notice of intent to adopt. In light of these facts, the agency's allegation of fraudulent misrepresentation is without merit.

The agency has suggested that the Lussiers violated their contractual agreement by concealing that Mrs. Lus-

sier had a "life threatening illness"[2] and by then proceeding with a single-parent adoption after her death, contrary to the agency's requirement of a two-parent family.

On contract principles alone, these contentions are refuted. Ms. Cardona knew of the illness before the child was given to the Lussiers. Secondly, it is difficult to view Mrs. Lussier's death as a volitional breach of contract. In short, even if there had been an enforceable agreement, the conduct of the agency's representative constituted a waiver of the disputed conditions.

Moreover, as I stated in the conclusions of law, under these circumstances, the contract is voidable.

"It has long been settled in this Commonwealth that a child is not a chattel, to be finally disposed of by agreement among parties. The *Stapleton* court remarked rather sharply that:

"One would expect the [agency] to be aware that such a contract is voidable by the courts when the best interests of the child conflict with it. Restatement, Contracts, §583." *Matter of Adoption of Sturgeon, supra* at 107, 445 A.2d at 1321 (citing *Stapleton v. Dauphin County Child Care Service,* 228 Pa. Super. 371, 381, 324 A.2d 562, 568 (1974)). Accordingly, I held that the Lussiers' contract with the agency did not bar the child's adoption by Mr. Lussier.

---

2. Ms. Cardona testified that she accepted Mrs. Lussier's representation that the cancer was no longer "life threatening." Ms. Cardona's action, however, was in derogation of the agency's express policy that a proposed adoptive parent would have to be cancer-free for five years prior to adoption.

APPENDIX

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

STATED FROM THE BENCH AUGUST 23, 1994

AS AMENDED AUGUST 25, 1994

"THE COURT: I am going to enter findings of fact and conclusions of law. I am going to try to do this in a fashion that I may from time to time explain the specific finding or conclusion that I make so the record will be clear as to why I came to the conclusions that I did. At least I will try to the best of my ability to do so."

Petitioner, Keith Lussier, and his wife, Kimberly, filed an application to adopt a Korean child with Love The Children on December 3, 1993.

Contact between the Lussiers and the agency was through the agency's representative in the Buffalo, New York area, a Ms. Marty Cardona.

The Lussiers had previously applied for adoption through an Erie County, New York Department of Social Services, without success.

The Erie County agency had completed a pre-adoption home study, which was submitted to and accepted by Love The Children.

In early December of 1993, the Lussiers were advised that their application to Love The Children was accepted, and on or about December 17, 1993, they executed an adoption placement agreement, which appears as exhibit P-3.

In addition, the Lussiers received documents containing extensive information concerning prerequisites

to adoption, regulations of the agency, an adoption questionnaire and other related information.

It is clear from the material that the agency anticipated that the proposed adoption would be by a stable, married couple.

One document supplied states, and I quote, "For infants, Korea requests that families be married at least three years——," it is exhibit R-1.

On the same date as the agreement (December 17, 1993), the Lussiers agreed to match with the subject child, a female born on or about October 17, 1993.

On December 19, 1993, the Lussiers were given pictures and history of the subject child. This was the first time they had any face-to-face contact with anyone from the agency.

On that date, they were advised that the child would arrive in six to eight weeks.

On January 13, 1994, Kimberly Lussier had an emergency hysterectomy and was diagnosed as having uterine cancer.

The Lussiers then advised the agency representative that they wished to delay the adoption and that they would return the pictures and information on the child.

At that time, the Lussiers knew of the conditions of the adoption, that it required a married couple and that there be no life-threatening illness. However, I note that at the same time, certainly the representative of the agency, Marty Cardona, also knew of those conditions and knew that Mrs. Lussier was in the hospital having a hysterectomy, having been diagnosed as having cancer and undergoing or was to undergo at that time chemotherapy.

After further discussion, particularly between Kimberly Lussier and Marty Cardona, it was decided that the proposed adoption could proceed.

On February 24, 1994, Kimberly Lussier was in the hospital undergoing chemotherapy.

The agency representative spoke to Kimberly Lussier in the hospital to advise her that the child would arrive at the airport in New York City the next day.

As of this date, the representative of the agency knew that there was a serious illness in existence, because she knew that Kimberly was in the hospital undergoing chemotherapy.

On February 25, 1994, Keith Lussier and his mother received the child from a representative of Love The Children at Kennedy Airport in New York.

On March 5, 1994, Ms. Cardona made her first visit to the Lussier home, where she interviewed the Lussiers and met the child.

A report of this visit was made to the agency. That report contains no reference to the operations that preceded or no report whatsoever of Mrs. Lussier's illness.

Notice of intention to adopt the child was filed on April 29, 1994, by Sanders D. Newman, Esquire, on behalf of the Lussiers.

Mr. Newman, an attorney with offices in Newtown, Bucks County, Pennsylvania, assumed to represent the Lussiers in processing the proposed adoption. He was recommended to the Lussiers by the agency.

By letter dated April 15, 1994, Mr. Newman advised the Lussiers that a hearing on the adoption would likely occur in July or August of 1994. Further, he acknowledged receipt of $200 on account of retainer and costs for his services. That is exhibit P-1.

Further notice of the anticipated adoption hearing was sent by Mr. Newman to the Lussiers by letter dated May 11, 1994, which is exhibit P-2.

Kimberly Lussier died on July 17, 1994.

On July 23, 1994, the agency representative took the child from the physical custody of Keith Lussier and placed the child with another unidentified family.

Ms. Cardona advised Mr. Lussier that the child was taken because it was now a single-parent adoption and it was against the regulations to have a single-parent adoption.

Let me add that subsequent analyses by the agency indicate that they have submitted other bases for their finding that the home was inappropriate beyond that stated, that it was merely a single-parent home. But I find that there is inadequate evidence that they had any information concerning what the future circumstances in that home would be other than speculation with regard to the time and circumstances leading up to Mrs. Lussier's death and assumptions what effect that would have on the child if the child had remained in the home.

A supplemental home study and psychosocial evaluation was submitted by Kenneth J. Herrmann Jr., Associate Professor of Social Work at the State University of New York College at Brockport. The report is dated August 6, 1994.

Based on this initial home study and the post-placement report and Doctor Herrmann's report, I conclude that the proposed adoption by Keith Lussier will benefit the needs and welfare of the subject child. Further, the evidence supports the allegations of the petition for adoption.

Let me make an aside to that last conclusion. The Adoption Act does not require that to approve an adoption you have to decide that it's in a child's best interest. That may be legislative genius or a fortunate legislative submittal. But I find that it is appropriate not to require that an adoption be in the child's best interest, because, as I had said at an earlier time in this hearing, we can always find some place which is better for our children; and the Act very specifically puts it in this language. This makes it possible for me to decide that under the circumstances of this case the proposed adoption would benefit the needs and welfare of the child at the time that the adoption would have come in the normal course of events, even as a single parent. It would be better for the child than to be not adopted. That is the only issue that can be before the court at the time of an adoption, as to whether or not the adoption before the court is better than not, and I find that if in the normal course of events the child had remained in the household in spite of the change in circumstances, I could have readily found based on the evidence I have heard here that the adoption would have benefitted the needs and welfare of the subject child.

I find that the refusal of Love The Children to consent to this adoption was initially based on the fact that this has become a single-parent adoption due to the untimely death of Mrs. Lussier. This is made clear by the agency's emphasis on the contractual and regulatory restrictions relating to married couples.

When the Lussiers filed the application for adoption, they did not anticipate that Mrs. Lussier would die within seven months from that date.

When the seriousness of Mrs. Lussier's illness was determined, this information was shared with the representative of the agency.

By the time of Kimberly Lussier's death, the child had become an integral member of the Lussier home and extended family.

As of the date that the child was removed from the home, her interests would have been better served by allowing the adoption to proceed.

I find that under the foregoing circumstances, the agency's married couple requirement is inapplicable and voidable as contrary to the best interest of the subject child.

The subsequently stated reasons for denying the consent are not supported by the circumstances established here.

The agency removed the child from the Lussier home three days[3] after the decease of Mrs. Lussier. The explanation of the potential consequences, although I accept are stated in good faith, I believe are insufficiently supported by the actual circumstances to be justified and are but speculation.

Let me make an aside to that finding. In every case where there is an adoption, I am sure that a good agency is concerned with what the results of that adoption might be. But we have to recognize that we are playing the odds. After an adoption is recommended, all kinds of trauma occur in households: people may die after the fact; one of the parties may lose a significant employment. We are dealing with whether or not it is appropriate to recommend that an adoption take place under the circumstances that are unknown. I believe that under the circumstances of this case, that the refusal

---

3. This should be six days.

to recommend the adoption was based on circumstances that were not known but presumed to exist and anticipated in a fashion that we have no way of knowing. On that basis, I find that the refusal of the consent is unreasonable. I make that as a specific finding.

I find that the withholding of consent by the agency on this basis, notwithstanding overwhelming evidence that the placement is otherwise desirable, is unreasonable.

I enter the following conclusions of law.

This court has jurisdiction over this matter. The child is in the legal custody of Love The Children, an adoption agency with its principal office in Quakertown, Bucks County, Pennsylvania.

The agency's contractual and regulatory provisions limiting adoption to married couples are deemed inapplicable in this case as not in the best interest of the child, and I cite for that *In re Adoption of Hess,* 530 Pa. 218, 226, 608 A.2d 10, 14 (1992) and the *Matter of Adoption of Sturgeon,* 300 Pa. Super. 92, 445 A.2d 1314 (1982).

I re-emphasize that this principle is applied here solely to the facts and circumstances of the instant case. It is not intended to invalidate the agency's requirement as a general principle.

However, our authority to find it voidable in this matter was set forth by Judge Montemuro in *Adoption of Sturgeon, supra* at 107, 445 A.2d at 1321, as follows:

"It has long been settled in this Commonwealth that a child is not a chattel, to be finally disposed of by agreement among parties. The *Stapleton* court remarked rather sharply that:

"One would expect that the [agency] to be aware that such a contract is voidable by the courts when

the best interests of the child conflict with it. Restatement, Contracts, §583. *Id.*, 228 Pa. Super. at 381, 324 A.2d 562.

"We reiterate at this time that an agreement of this type is voidable. Persons standing *in loco parentis* to a child *are not bound by such an agreement when they sincerely feel that it no longer serves the child's best interests.*" (emphasis in original)

The next conclusion of law. The agency's refusal to consent to the adoption is being unreasonably withheld and, therefore, is not required, and I cite 23 Pa.C.S. §2713(2), and I quote: "[T]he court, in its discretion, may dispense with consents ... when ... the adoptee is under 18 years of age and has no parent living whose consent is required," and cite again *In re Adoption of Hess, supra* at 226, 608 A.2d at 14.

A new finding. The requirements of the law have been met and the child's adoption by Keith Lussier will benefit her needs and welfare. I am therefore signing the decree of adoption.

I enter as an additional and separate order: "And now August 23, 1994, upon consideration of the evidence and arguments in the case before me, that the agency, Love The Children, deliver the physical custody of the child in question to Mr. Lussier on or before Sunday, August 27, 1994." That is this Sunday. That's a separate order and is an order of custody.

"MR. TOTARO: Your Honor, August 27 is a Saturday.

"THE COURT: Excuse me, the 28th. I'm changing it to the 28th. I wanted to allow the weekend."

It has been suggested at this hearing and perhaps elsewhere that my decision in this matter would be dictated by all of the newspaper articles and by the pressure of public concern. I want to make something

very clear. This decision was very difficult for me because I know that the agency in question, Love The Children, is a good agency. There have been in excess of 2,000 adoptions brought by that agency through my court. I believe that what they did in this case was inappropriate, but I believe it was a mistake. One mistake in 2,000 or 2,500 cases is not such a bad record. I don't believe that what has occurred here should in any way reflect on the intentions and the ability of the people who run that agency to do it appropriately. I believe that there was an unfortunate combination of circumstances involved in this case which included, unfortunately, the failure of the field representative to give early and adequate information to the agency's headquarters. But as I said, this is not an issue of contract. This is an issue of rules and regulations.

We have precedent for ignoring contracts when they deal with the custody of children. In family court, parents cannot bind their children to agreements with regard to custody. They are always subject to review for what is appropriate for the child, and my decision in this case is based solely on what I deem to be a fair judgment of what would have been the appropriate thing to do after the death of Mrs. Lussier.